

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

DMP:ICR/JEA
F. #2020R00514

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 28, 2022

By Hand and ECF

The Honorable Dora L. Irizarry
United States District Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

      Re:    United States v. Samantha Shader
                  Criminal Docket No. 20-202 (DLI)

Dear Judge Irizarry:

        The government respectfully submits this memorandum in advance of the sentencing hearing in this case for defendant Samantha Shader ("Shader"), which is currently scheduled for October 14, 2022. As set forth below, the government respectfully requests a Fatico hearing as to certain disputed issues, and is prepared to proceed with a hearing subject to the Court's availability. For the reasons detailed below, the government respectfully submits that the Court should reject the defendant's objections to the PSR and the PSR's Guidelines calculation and sentence Shader to a term of imprisonment at the low end of the applicable Guidelines range of 87 to 108 months' imprisonment. (Presentence Investigation Report ("PSR") ¶ 79).

    I.    Facts

        The PSR accurately describes the offense conduct in this case. See PSR ¶¶ 3-17. On May 25, 2020, Minneapolis Police Department Officer Derek Chauvin, a white man, murdered George Floyd, an African American man, by kneeling on his neck and asphyxiating him for nine minutes while arresting him for using counterfeit U.S. currency. George Floyd's murder by a police officer galvanized large nationwide protests focused on police brutality against African Americans.

### A. Shader's Preparations for and Travel to the Protest in Brooklyn

On May 29, 2020, Shader, sent a message to Timothy Amerman ("Amerman")[1], and invited Amerman to join Shader and her sister, Darian Shader ("Darian") on a trip to New York City to join a protest march planned for that evening. Shader asked Amerman, in sum and substance, whether he wanted to "go down to the City to cause some hell." Amerman declined Shader's invitation to go to New York City, but he agreed to provide her with certain materials, including a bag containing masks, rope, plastic baggies, marijuana, two cans of paint, and his recycling bin containing glass bottles. Shader went through Amerman's recycling bin and took glass bottles from the bin and also took a hammer and tire iron from Amerman's house. Shader and Darian thereafter left Amerman's house and met a friend who drove them the rest of the way to Brooklyn.

Later that evening, Shader participated in a protest in Crown Heights, Brooklyn. At approximately 11:00 p.m., an NYPD van was briefly parked in the crosswalk of Eastern Parkway and Washington Avenue in Crown Heights. At that time, according to the van's driver, an NYPD community affairs detective, members of the crowd started to become hostile. As a result, the NYPD community affairs detective and three other NYPD officers got into the van for their safety. While the four officers were inside the van, both its emergency lights and its front headlights were on.

Shortly after the officers got into the NYPD van, and as the driver was turning the van in the crosswalk to try to avoid the crowd, Shader threw a Molotov cocktail at the van. A video provided to law enforcement from a witness ("Witness-1") captured the events. The video showed a chaotic, crowded scene during which Shader first lit and then threw the Molotov cocktail at the NYPD van.

---

[1] Amerman subsequently pleaded guilty before Your Honor to one count of conspiracy, in violation of 18 U.S.C. § 371, to commit civil disorder, contrary to 18 U.S.C. § 231(a)(3). See United States v. Amerman, No. 21-CR-126 (DLI).



As Shader lit the Molotov cocktail, Witness-1 can be heard saying in part "what is she doing" as an unidentified person repeated the phrase "uh-oh, uh-oh." The video then captured Shader walk parallel to the NYPD van, and then re-enter the frame of the video yelling "get out the motherfucking way," apparently to others nearby, as she threw the Molotov cocktail at the NYPD van. The video further showed that as the Molotov cocktail flew towards the NYPD van, its wick—later identified as a white rag—appeared to be smoldering.



After Shader's Molotov cocktail hit the side of the van, three officers got out of the van and chased Shader. One of the officers caught up with Shader and attempted to arrest her.

Shader resisted and bit the NYPD officer on the leg. As the NYPD officer arrested Shader, Darian emerged from the crowd and jumped on his back in an effort to prevent her sister's arrest. Darian was thereafter placed under arrest and her backpack was seized and searched incident to her arrest. NYPD officers recovered from the backpack, among other things, spray paint, a metal lug wrench, a metal jack crank, rope, bandanas, and her cellphone.

On April 25, 2022, Shader pleaded guilty pursuant to a plea agreement to Count Two of the indictment, which charged her with arson, in violation of 18 U.S.C. § 844(i). PSR ¶ 1.

   I.   Applicable Law

Title 18, United States Code, Section 3553(a) requires a sentencing court to "determine in each case what constitutes a sentence that is 'sufficient, but not greater than necessary,' to achieve the overarching sentencing purposes of 'retribution, deterrence, incapacitation, and rehabilitation.'" Rosales-Mireles v. United States, 138 S. Ct. 1897, 1903 (2018) (quoting 18 U.S.C. § 3553(a) and Tapia v. United States, 564 U.S. 319, 325 (2011)). "[I]n determining the particular sentence to be imposed" the Court is required to consider both the sentencing factors set forth at § 3553(a)(2), as well as the sentencing range established by the Sentencing Commission for the applicable category of offense and offender. See 18 U.S.C. § 3553(a)(4). Thus, "[a] district court is procedurally obligated to calculate and consider the Sentencing Guidelines in reaching an independent decision as to sentence," United States v. Awan, 607 F.3d 306, 312 (2d Cir. 2010), and "[a] district court should normally begin all sentencing proceedings by calculating, with the assistance of the Presentence Report, the applicable Guidelines range," which "provide the 'starting point and the initial benchmark' for sentencing." United States v. Cavera, 550 F.3d 180, 189 (2d Cir. 2008) (en banc) (quoting Gall v. United States, 552 U.S. 38, 49-50 (2007)).

Although the United States Sentencing Guidelines ("U.S.S.G." or the "Guidelines") are advisory, see United States v. Booker, 543 U.S. 220 (2005), "sentencing judges remain under a duty with respect to the Guidelines . . . to 'consider' them, along with the other factors listed in section 3553(a)" in determining what sentence to impose, see United States v. Crosby, 397 F.3d 103, 111 (2d Cir. 2005). Thus, while a district court retains wide discretion in sentencing a defendant, that discretion applies not to the calculation of the Guidelines but rather to the subsequent decision whether "to deviate from the Guidelines once properly ascertained." See United States v. Thomas, 628 F.3d 64, 71 (2d Cir. 2010); accord, e.g., United States v. Dorvee, 616 F.3d 174, 180 (2d Cir. 2010) ("Once the proper Guidelines sentence has been ascertained, a sentencing court should consider the § 3553(a) factors to determine whether a non-Guidelines sentence is warranted.").

II.    Sentencing Guidelines

A. The PSR's Guidelines Sentencing Range

Applying the U.S. Sentencing Guidelines Manual to the facts detailed above, the government and the Probation Department have each independently determined that the applicable Guidelines range for the defendant is 87 to 108 months' imprisonment.

The government submits that the PSR sets forth the applicable Guidelines calculation, which is reflected below:

| | |
|---|---|
| Base Offense Level (U.S.S.G. § 2K1.4(a)(1)) | 24 |
| Plus: Official Victim Enhancement (U.S.S.G. § 3A1.2(c)(1)) | +6 |
| Less: Acceptance of Responsibility (U.S.S.G. § 3E1.1(a)) | -2 |
| Less: Acceptance of Responsibility (U.S.S.G. § 3E1.1(b)) | -1 |
| Total: | 27 |

PSR ¶¶ 21-30.

According to the PSR, the defendant has seven prior arrests and 5 convictions that resulted in custodial sentences. PSR ¶¶ 33-39. As a result, her criminal history category is set at Category III. At Criminal History Category III, an offense level of 27 carries an advisory Guidelines sentencing range of 87 to 108 months in custody. PSR ¶ 40. Count Two also carries a 5-year mandatory term of imprisonment. See 18 U.S.C. § 844(i).

The defendant objects to both the calculation of the base offense level and to the official victim enhancement. For the reasons set forth below, the Court should reject both of these objections.[2]

B. A Base Offense Level of 24 Is Correct Because the Defendant's Conduct Created a Substantial Risk of Death or Serious Bodily Injury to Another Person

The government agrees with the Probation Department that the Base Offense Level in this case is 24 because the defendant possessed and threw a Molotov cocktail improvised incendiary device at an NYPD van which she knew to be occupied by NYPD officers, and thus that "the offense created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly." U.S.S.G. § 2K1.4(a)(1)(A).

---

[2] The defendant also raised objections to certain facts contained in the PSR, which the Probation Department rejected. To the extent the defendant seeks to re-raise any such factual objections before the Court, the government is prepared to establish any relevant facts at an evidentiary hearing pursuant to United States v. Fatico, 579 F.2d 707 (2d Cir. 1978).

5

(See PSR ¶ 21). The defendant claims that Section 2K1.4(a)(1) and (a)(2) should not apply because the bottle that the defendant threw was not a Molotov cocktail and "therefore did not create a substantial risk of death or serious bodily injury." (See Def.'s PSR Letter at 3 (Objection to PSR ¶ 21)). Specifically, the defendant argues that she did not use a "Molotov cocktail" or "incendiary device"[3] because the bottle that she threw at the NYPD van was not breakable, did not contain an inflammatory or incendiary liquid, and did not include a wick capable of igniting a flammable substance. (See Def.'s PSR Letter at 2 (Objections to PSR ¶¶ 9, 10, 11, 12, 14, 15, 91)).

As an initial matter, the government respectfully submits that Shader's argument is foreclosed by her plea allocution during her change of plea hearing on April 25, 2022, during which she swore under oath that she used an "explosive or incendiary device," as defined in 18 U.S.C. § 232. Shader stated under oath that she used a lighter and "tried to light a piece of material that was sticking out of a bottle that I believed contained a flammable substance." Change of Plea Tr. 34:7-11.[4] If Shader did not believe that the bottle contained a combustible liquid and only

---

[3] The term "destructive device" is defined in both 18 U.S.C. § 921 and 26 U.S.C. § 5845 as "(1) any explosive, incendiary, or poison gas (A) bomb, (B) grenade, (C) rocket having a propellent charge of more than four ounces, (D) missile having an explosive or incendiary charge of more than one-quarter ounce, (E) mine, or (F) similar device . . . and (3) any combination of parts either designed or intended for use in converting any device into a destructive device. 18 U.S.C. § 921(a)(4); 26 U.S.C. § 5845(f). In like manner, the term "explosive or incendiary device" is defined in 18 U.S.C. § 232 as "(A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone."

Further, contrary to the defendant's argument, a destructive or incendiary device does not have to be complete or fully functional to be classified as a destructive device. See United States v. Sheehan, 838 F.3d 109, 122 (2d Cir. 2016) ("Even where a device . . . is defective in some way because not all of the parts are in place, the text of the statute is satisfied if the device has been designed (in an objective sense) in such a way that it can be easily converted into an effective explosive.") For example, in a case involving a plastic pipe bomb containing smokeless powder but no "classic initiator" that had been left at the site of a robbery to sow confusion and divert police attention, the Sixth Circuit explained that "to qualify under the statute, we do not require that the destructive device operate as intended." United States v. Langan, 263 F.3d 613, 625 (6th Cir. 2001). Nor must the government "establish that any particular component be present for a device to qualify as a destructive device. The only requirement is that the device be capable of exploding or be readily made to explode." Langan, 263 F.3d at 625.

[4] As noted above, Shader's objections to the PSR are in contravention of her plea allocution and her plea agreement. To the extent that Shader persists in her objections, the government agrees with Probation that the Court may consider whether the defendant has fully accepted responsibility for her conduct.

intended to smash a window with the bottle (as she now contends in her objection to the PSR), it makes little sense why Shader would have lit the wick inside a bottle. Taken together, the lighter, the wick, the bottle and the flammable liquid constitute a Molotov cocktail improvised incendiary device.

Should the Court have any factual question whether the device Shader threw constituted a Molotov cocktail, the government requests a <u>Fatico</u> hearing at which it will establish by a preponderance of the evidence that it was and that Shader's actions "created a substantial risk of death or serious bodily injury to any person other than a participant in the offense, and that risk was created knowingly." U.S.S.G. § 2K1.4(a)(1)(A).

The preponderance of the evidence in this case clearly supports the finding that the glass bottle the defendant threw at the NYPD van was breakable, contained a flammable liquid and a wick, and was indeed a destructive/incendiary device. At a <u>Fatico</u> hearing the government would introduce, among other evidence, testimony from a member of the NYPD's Emergency Service Unit who rendered the bottle safe by pouring out a clear liquid contained in the bottle and using pliers to remove a liquid-soaked white cloth from the neck of the bottle. The government also expects that the witness will testify that the poured liquid smelled like acetone or nail polish remover. In addition, an FBI Explosives and Hazardous Devices Examiner has opined, through a review of physical items such as the bottle and the video recording of the attack, that there is evidence of an improvised incendiary device.



Furthermore, the video of the defendant's attack depicted her using a lighter to ignite a rag hanging out of the bottle and then loudly warning others nearby to get out of the way before she threw the Molotov cocktail with a smoldering wick at the NYPD van, making plain that the defendant knew that she was wielding a dangerous incendiary device, and not merely a glass bottle.

The evidence would also prove that Shader's actions knowingly created a substantial risk of death of serious bodily injury to another person. Indeed, the government submits that it could not reasonably be disputed that, once the Court finds the device Shader threw to be an incendiary/destructive device, that it could have caused serious injury or death to the officers inside the NYPD van if it had functioned as intended.[5]

In addition, however, and as referenced in the Guidelines estimate at paragraph 2 of the defendant's plea agreement, the Base Offense Level of 24 is also supported by U.S.S.G. § 2K1.4(a)(1)(B), because "the offense . . . involved the destruction or attempted destruction of . . . . a state or government facility," namely the NYPD van. The Guidelines provide that the term "state or government facility" is defined by reference to 18 U.S.C. § 2332f(e)(3), see U.S.S.G. § 2K1.4 cmt. n.1, which defines that term to "include[] any permanent or temporary facility or conveyance that is used or occupied by representatives of a state, members of Government, . . . or by officials or employees of a state or any other public authority or entity . . . in connection with their official duties." Under 18 U.S.C. § 2332f(e)(12), the term "state" is further defined to have "the same meaning as that term has under international law, and includes all political subdivisions thereof."

A "conveyance" is a general term that refers to "[a] means of transport; a vehicle," CONVEYANCE, Black's Law Dictionary (11th ed. 2019), such as the NYPD van. See 18 U.S.C. § 2332f(e)(7) (defining "public transportation system" to mean "all facilities, conveyances, and instrumentalities, whether publicly or privately owned, that are used in or for publicly available services for the transportation of persons or cargo"); see also, e.g., 7 U.S.C. § 8302(11) ("The term 'means of conveyance' means any personal property used for or intended for use for the movement of any other personal property"), 19 U.S.C. § 1459 (using "conveyance" to refer to vessels, vehicles and aircraft), 38 U.S.C. §§ 3901-03 (using term "automobile or other conveyance"). Moreover, the NYPD van was used by employees of the City of New York, a political subdivision of the State of New York and of the United States (and in any event, a "public authority"), in

---

[5] The defendant also claims that she did not create a substantial risk of death or serious bodily injury to another person because she had "consumed large quantities of alcohol" and "was extremely disoriented." See Def.'s PSR Letter at 2. For the reasons stated below regarding the victim related adjustment, the government also requests a Fatico hearing to refute Shader's argument that she was impaired at the time she threw the Molotov cocktail.

8

connection with their official duties. Thus, U.S.S.G. § 2K1.4(a)(1)(B) also applies and would trigger the application of base offense level 24 even if § 2K1.4(a)(1)(A) did not.

The defendant does not contest in her PSR objection this basis for the application of the base offense level.

### C. The Victim Related Adjustment Is Correctly Applied

The defendant also objects to the PSR's application of a 6-level enhancement for assault on a law enforcement officer in a manner creating substantial risk of serious bodily injury, pursuant to Guidelines Section 3A1.2(c)(1). (See Def.'s PSR Letter at 3-4 (Objection to PSR ¶ 23)). For the reasons stated above, the government requests a Fatico hearing in which it will establish that Shader acted with the requisite mens rea for the enhancement to apply.

The official victim enhancement of Guidelines Section 3A1.2(c)(1) directs the Court to "increase by 6 levels" the defendant's offense level "[i]f in a manner creating a substantial risk of serious bodily injury, the defendant . . . knowing or having reasonable cause to believe that a person was a law enforcement officer, assaulted such officer during the course of the offense or immediate flight therefrom." Id. The Second Circuit has held that the word "assault" refers to the common-law offense of assault, which "consisted of either attempted battery or the deliberate infliction upon another of a reasonable fear of physical injury." United States v. Delis, 558 F.3d 177, 180 (2d Cir. 2009).

In applying this Guidelines provision, the facts in this case clearly support the conclusion that the defendant used a Molotov cocktail to target law enforcement officers and did so in a manner that created a substantial risk of serious bodily injury. The defendant's claim that she believed that the van was not occupied is implausible and contrary to the evidence. At a Fatico hearing, the government will offer video and other evidence showing that Shader was looking directly at the NYPD van, which was approximately 20 feet away, when she threw the Molotov cocktail, that the NYPD van had both its emergency lights and its front headlights on, and that the

driver's window of the NYPD van was not tinted, and the interior dashboard lights were illuminated and visible through the glass in the video.





Moreover, the video also refutes Shader's argument that she was impaired at the time she threw the Molotov cocktail. First, she appeared balanced as she lit the Molotov cocktail. Second, as she walked near the NYPD van, she waited more than 20 seconds before throwing it at

10

the van. Third, her statement "get out the mother fucking way," suggested that she did not want to harm the other protesters, but rather her specific target – the NYPD van and its passengers. As noted above, the government anticipates offering witness testimony that officers had recently entered the van and that they had begun to move the van shortly before the defendant's attack. The evidence will establish that the defendant knew or had reasonable cause to believe that law enforcement officers were in the NYPD van and that the defendant – in throwing a lit Molotov cocktail at the van – created a substantial risk of serious bodily injury to the NYPD officers. Accordingly, the facts of this case support the application of this enhancement.

### III.  The 18 U.S.C. § 3553(a) Sentencing Factors

The defendant's targeting of an NYPD van containing 4 officers with a Molotov cocktail is extremely dangerous criminal conduct that warrants a serious sentence. Both in selecting an appropriate charge to resolve this prosecution by plea agreement, and in recommending an appropriate sentence, the government has given careful consideration to the full range of aggravating and mitigating factors that the Court must consider at sentencing under 18 U.S.C. § 3553(a). In the government's view, and for the reasons discussed below, the government respectfully submits that a sentence at the low end of the Guidelines range of 87 to 108 months' imprisonment would be sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case. See 18 U.S.C. § 3553(a).

"The nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), and "the seriousness of the offense," id. § 3553(a)(2)(A), merit a sentence at the low end of the Guidelines range of 87 to 108 months' imprisonment. As noted above, the defendant's intentions on May 29, 2020 was not to participate as a peaceful protester but instead to "go down to the City to cause some hell." And the defendant did just that when she decided to throw a Molotov cocktail at an NYPD van. This type of attack would have been catastrophic had it been carried out as intended. Shader's actions make plain that the bottle was not just being used as a projectile to damage property, but instead was being used as a Molotov cocktail. Thus, the seriousness of Shader's conduct and the need for a significant sentence is sufficiently met here.

Moreover, the defendant's weapon of choice—fire—presented a particularly severe risk of danger because she could not control who or what would be harmed by the fire once set. Shader could not know whether the NYPD van contained within it combustible or explosive materials, such as ammunition. As evident in the surveillance video, a large crowd was near the NYPD van when Shader threw the Molotov cocktail. Had the Molotov cocktail worked as intended, the fire could easily have spread, causing more damage to property and threatening human life. Even more, the defendant's actions upon arrest further show her lack of respect for law enforcement. As noted above, upon arrest, Shader not only resisted arrest but bit the arresting officer on the leg. Again, the seriousness of Shader's conduct during her arrest further supports need for a significant sentence.

A sentence at the low end of the Guidelines range of 87 to 108 months' imprisonment in this case is also necessary "to afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). Indeed, the need for deterrence is especially important given the need to prevent others from following the defendant's example and using force against law enforcement. Given the gravity of the offense and the potential catastrophic damage that might have occurred

11

had Shader achieved her aim of firebombing an occupied NYPD van, this Court should make clear to anyone contemplating similar actions that such an offense will be punished severely.

There is also a strong need for individual deterrence. Shader has demonstrated a willingness to target law enforcement officers through violence. Her criminal history exhibits how she has lived a life of repeated encounters with law enforcement, with multiple arrests and convictions, including acts of violence, such as an assault, theft and drug possession.

The government also requests that the Court, consistent with the plea agreement, impose restitution in the amount of $150.80, for the destruction caused by the defendant to the NYPD van.

IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court sentence Shader to a term of imprisonment at the low end of the Guidelines range of 87 to 108 months' imprisonment.

Respectfully submitted,

BREON PEACE
United States Attorney
Eastern District of New York

By:   /s/
Ian C. Richardson
Jonathan E. Algor
Assistant U.S. Attorneys
(718) 254-7000

cc: Clerk of Court (DLI) (by Hand and ECF)
Steven S. Guttman, United States Probation Officer (by Email)
Samuel Jacobson, Esq. and Leticia Olivera, Esq. (by ECF and Email)