# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

**David E. Patton**
*Executive Director and*
*Attorney-in-Chief*

**Deirdre D. von Dornum**
*Attorney-in-Charge*

October 24, 2022

<u>To Be Filed Under Seal</u>
<u>By ECF And Email</u>
The Honorable Judge Irizarry
United States District Court Judge
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:   <u>*United States v. Samantha Shader*</u>, No. 20-CR-202 (DLI)

Dear Judge Irizarry:

Samantha Shader will never forget what she did on the night of May 29, 2020. Not because of her arrest, subsequent prosecution, and incarceration, or even of the sentence she will soon receive from this Court. She will never forget her actions that night because they forever changed her. The destruction and fear she caused and the potential for much graver harm because of her reckless, dangerous behavior are not things that she can erase from her memory, nor does she want to. They plague her thoughts daily and, yet, these events have also been the catalyst for her most genuine efforts at rehabilitation.

Ms. Shader's knows her crimes were serious. She fully understands that they evinced a disregard for the law and the safety of police and civilians that night. She also understands that her criminal behavior fundamentally tarnished the spirit of peaceful protest of the actions of bad government actors. Many protestors took to the streets in May 2020 seeking to use their voices to call out unlawful violence against communities, not to perpetuate that violence themselves or harm those members of law enforcement who take their oath to protect the public seriously. When Ms. Shader came to New York City to join hundreds of thousands of others protesting the murder of George Floyd she had no plan or desire to harm law enforcement. She came with the agenda to be one of those voices - raised in protest of the murder of a man by the actors put in place to protect, not harm, the communities they serve.

Ms. Shader's emotional upset, buoyed by a lifetime of severe and enduring trauma and violence inflicted upon her by individuals she trusted and hoped would protect her, played a significant role in her brazen actions that night. The murder of Mr. Floyd triggered not so old feelings surrounding her own victimization which resulted both in her regrettable choice to abuse alcohol and illicit substances and to create the perfect storm that ultimately ended in her dangerous and criminal behavior.

When Ms. Shader arrived at the protest, inebriated and emotional, the scene was violent, tumultuous, and chaotic. It is amidst this turmoil Ms. Shader made the regrettable and impulsive choice to attempt to light and ultimately throw the bottle at a police van. In making that choice she endangered the lives of others and forever changed her own life, a reality she did not consider or even begin to understand until she sat crying genuine tears of regret during her interrogation. Months and now years later, Ms. Shader continues to reflect on how she arrived here – an explanation that necessarily includes the complexities of her personal history. That history is a combination of her own poor choices and the incredible damage and pain inflicted upon her by others since childhood. We offer the Court this more complete picture of Ms. Shader's life not to excuse or justify her crimes but to provide context for how she arrived here, before the Court, awaiting sentence for these crimes, as well as provide a lens for the Court to evaluate her evolution over the past two years.

Ms. Shader, ███████████████████████████████████████
███████████████████████████████████████████████
███████████████████████████████████ engagement in criminal activity and severely flawed decision making – all which led her to this arrest and conviction. Refusing to accept this narrative of her life as permanent, she is determined and committed to changing it. While this will not undo the harm she caused by her actions in May 2020, she hopes that, even in a small way, her redemption will help divert others from a path she found herself on for entirely too long.

Samantha Shader understands that her crimes require an incarceratory sentence. During the pendency of this case, she has never requested release on bond, or considered asking the Court to entertain such a request. She also understands that her sentence must be significant and commensurate with the severity of her crime. However, Ms. Shader asks that the Court consider her immense and consistent efforts change her life since she was incarcerated. She is sober. She is committed. She envisions a future for herself. For the first time in her life she is dealing with deep scars that have plagued her since childhood. And Ms. Shader is reflective of her past actions and holding herself accountable for the harms that she has inflicted. We request the Court sentence Ms. Shader to 60 months incarceration. This is a sentence that will allow Ms. Shader the opportunity to continue her rehabilitation while simultaneously achieving the goals of sentencing.

## <u>TABLE OF CONTENTS</u>

I.   S AMANTHA SHADER'S PERSONAL HISTORY ............................................................. 5

A.   Samantha's Roots and Early Childhood ........................................................ 5

Samantha's parents ............................................................................................. 5

Kaleb ................................................................................................................... 5

Amy and Shawn's parenting and abuse .............................................................. 7

Separation and divorce ....................................................................................... 7

Struggles in school ............................................................................................. 8

B.   Adolescence ................................................................................................... 9

Family court battle ............................................................................................ 10

Substance abuse begins ..................................................................................... 10

The death of her best friend, Evan Wisniewski, and the onset of severe drug use ............................ 11

Juvenile arrest and probation ............................................................................ 12

Medical neglect and back injury ....................................................................... 14

Samantha's last months in Saugerties ............................................................... 15

Rainbow Gathering, ███████████ and running away for good ........................................... 16

C.   Samantha's Decade as a Transient, Homeless Youth ................................... 16

First attempt to run away .................................................................................. 17

"Dirty kids" ....................................................................................................... 17

Height of drug abuse and addiction .................................................................. 17

Victimized by violence ..................................................................................... 18

Violence at the hands of police ......................................................................... 19

Tenuous family connections ............................................................................. 20

D.   Samantha's Return to Saugerties ................................................................. 21

Detoxifying from heroin and a toxic relationship ............................................ 21

Struggles with alcohol and marijuana .............................................................. 22

The death of her best friend, Michael Layshock ............................................. 22

The murder of George Floyd, subsequent protests, and Samantha's arrest ....................... 22

II.   OFFENSE CONDUCT ............................................................................................. 23

A.   Samantha Shader Has No Political Affiliations That Spurred Her Desire to Attend the Protest ... 24

B.   Ms. Shaders Behavior Leading Up to the Crime Evinces a Lack of Premeditation of the Offense 25

C.   Samantha Shader Was Acting Impulsively in a Chaotic and Tumultuous Environment ............... 26

D.   Samantha Shader Received the Bottle at the Protest, She Had No Plan or Tools to Create the Device Before She Arrived ........................................... 27

E.   Ms. Shader's Subjective Belief that the Vehicle Was Empty ....................................... 27

F. Ms. Shader Used an Inoperable and Poorly Constructed Molotov Cocktail .....................................29

The evidence shows that the explosive device was not fully functional..............................................29

Ms. Shader's use of an explosive device with an ineffective container is further evidence of lack of premeditation. ..........................................................................................................................................30

The bottle does not appear to have contained enough flammable or incendiary liquid to readily ignite. .....................................................................................................................................................30

Before throwing it, Ms. Shader unsuccessfully attempted to light the cloth in the bottle. ................31

III.   CASE COMPARISONS ..................................................................................................................32

   A.   A Sentence of 60 Months Would Avoid Unwarranted Sentencing Disparities ..............................32

   B.   Ms. Shader Should Not Receive a Higher Sentence Than Defendants Who Targeted Police Vehicles And Precincts They Knew To Be Occupied ......................................................................33

   C.   Ms. Shader Should Not Receive a Higher Sentence Than Defendants Who Carried Out Successful Incendiary Attacks on Police Vehicles and Government Buildings ....................................................35

   D.   Ms. Shader Should Not Receive a Higher Sentence Than Defendants In Other Relevant Assault On Law Enforcement Officer Cases ..................................................................................................38

   E.   Ms. Shader Should Not Receive a Higher Sentence Than Defendants Who Assaulted Law Enforcement Officers During the January 6 Insurrection ................................................................39

   F.   Ms. Shader Should Not Receive a Higher Sentence Than Defendants In Other Arsons Who Caused Extensive Damage and Risk to Life ....................................................................................42

IV.   REMORSE AND REHABILITATION................................................................................................43

   A.   Trauma Connection to Arrest Conduct ...........................................................................................43

   B.   Samantha's Genuine Remorse .......................................................................................................45

   C.   Pretrial Detention at MDC Brooklyn ..............................................................................................46

   High School Equivalency ......................................................................................................................46

   Columbia University Justice-in-Education Program ............................................................................47

   Programming and absence of disciplinary records ..............................................................................47

   Exploration of trauma and its connection to her arrest ......................................................................48

   Looking ahead to a bright future..........................................................................................................48

   D.   Impressions and Recommendations................................................................................................49

V.   CONCLUSION.................................................................................................................................51

# I.     SAMANTHA SHADER'S PERSONAL HISTORY

## A. Samantha's Roots and Early Childhood

Samantha's childhood evokes a striking image: a chaotic home life of violence, abuse, and neglect, set within the picturesque, quiet town of Saugerties. As a young girl, Sam was subjected to unyielding, severe violence within the confines of her home, yet outside her window was a beautiful town nestled along the Hudson River. The small town of Saugerties was a place where everyone knew each other. The Shaders were well-known in town; the local police were often called to Samantha's home due to ongoing conflict and turmoil, and her father's business was an important part of the community. Saugerties was where Samantha would experience a pattern of trauma that would impact the rest of her life.



Saugerties, NY, retrieved from
https://exploringupstate.com/

*Samantha's parents*

Samantha's mother, Amy Shader (nee Schweter) moved to Saugerties from Long Island when she was five years old. Mrs. Shader's mother and father immigrated to New York from Norway and Germany, respectively, and were strict Jehovah's witnesses. Mrs. Shader's father was an alcoholic who physically and sexually abused his three daughters and wife. The severe abuse manifested in generations of mental health issues and trauma within the family unit.

Shawn Shader—Samantha's father—was born and raised in Saugerties. His family is well-established in the town and has lived there for generations. Mr. Shader founded and owns his own septic company called Shader's Septics. Mr. Shader's father passed away twenty years ago and his mother is in poor health after suffering a stroke. Mr. Shader is one of four sons.

Amy and Shawn Shader met in high school and became romantically involved. At age seventeen, Mrs. Shader became pregnant unexpectedly with their first child, Kaleb. Her very religious and conservative parents disowned her. Mrs. Shader moved in with Mr. Shader's parents and the two married.

*Kaleb*

At age eighteen, Mrs. Shader gave birth to Kaleb. As a young child, ████████ ████████████████████████████████████████████████ and even as a child often became violent.

████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ and
volatile interpersonal conflict with Mr. Shader.

Amidst and despite her psychological struggles and interpersonal conflict with Mr. Shader, Mrs. Shader gave birth to Samantha. ████████████████████ likely had significant consequences for Samantha's subsequent development and health.[1]

As Kaleb got older, he turned to Samantha as his primary victim upon which to enact his behavioral problems. When she was just a baby, Kaleb threw Tonka truck toys and other heavy items into her crib. Kaleb's menacing became so pervasive that Mrs. Shader had to purchase a net to cover baby Samantha's crib. He would punch, kick and relentlessly beat Samantha throughout her childhood.

████████████████████████████████████████████████████████ The older and stronger Kaleb grew, the more erratic and dangerous his behavior became. He chased Samantha around the house with weapons such as knives and physically assaulted her. Kaleb's abuse became so dangerous that when Samantha was only six years old, her parents installed dead bolt locks on her bedroom door to keep him out. The family recalled many occasions when they would barricade themselves in the bathroom while Kaleb lashed out during one of his violent episodes.

When Samantha asked for help or expressed fear of Kaleb, Mrs. Shader replied that Kaleb was "special" and even blamed Samantha for making him angry. Samantha internalized that her basic need for safety was secondary to keeping Kaleb happy and undisturbed. Very young and ill-equipped to handle Kaleb, Mr. and Mrs. Shader did not enforce the adequate structure or treatment to help Kaleb through his difficulties, nor did they keep Samantha safe or support her significant emotional needs.

Instead, Mrs. Shader called the Saugerties Police Department on Kaleb dozens of times over the course of Samantha's childhood, starting when Kaleb was around eight years old. The police would try to diffuse the situation, but would often just leave and the violence would soon resume again.

On approximately four occasions, the police removed Kaleb from the home. ████████████████████████████████████████████████████████████

Sergeant Jorge Castagnola of the Saugerties Police Department responded to many of Mrs. Shader's 911 calls on Kaleb. ████████████████████████████████████

---

[1] Schetter, C.D. & Tanner, L. 2012. Anxiety, depression and stress in pregnancy: implications for mothers, children, research, and practice. *Current Opinion in Psychiatry.* 25(2): 141-148; Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4447112/.

 Seeing Kaleb in that state, he recalled, was disturbing to witness.

Sgt. Castagnola acknowledged that Samantha had a very troubled home life. Notably, however, he remembered Samantha as a happy-go-lucky, lovely child when she was not home. Sgt. Castagnola boarded his horse on Mr. Shader's property, so he saw Samantha frequently. She was bubbly, outgoing, and loved the horses.

Home was where Samantha was scared and sad. It was a not a safe refuge from the outside world. Rather, it was the place where she needed the most safety. Kaleb terrorized Samantha and her parents did not sufficiently protect her. She became accustomed to violence and the expectation that only she could protect herself.

### Amy and Shawn's parenting and abuse
Mr. and Mrs. Shader each parented their children very differently. Mrs. Shader was very erratic and her discipline was unpredictable. Sometimes she did not enforce rules or consequences, so the children were allowed to run amok. Other times would employ extreme disciplinary tactics. In contrast, Mr. Shader disciplined the children when he came home from work. He recalled returning home from work to a disheveled house with no food, the children unkempt, and Amy sometimes nowhere to be found.

Both Mr. and Mrs. Shader employed

and it was a source of commonality and unification amongst the usually discordant siblings.

### Separation and divorce
The Shaders began the process of legally separating when Samantha was around six years old. According to the family, Mrs. Shader had an affair around the time she became pregnant with Darian, her third child with Mr. Shader. It was the final straw for Mr. Shader, and he moved out.

Both Mr. and Mrs. Shader quickly remarried. Mrs. Shader married Mr. Shader's friend Ron Biscoe, a successful businessman in the neighborhood, and Mr. Shader married Laurie

Schultis, whose family had been in Saugerties for a long time. Both Mr. Biscoe and Ms. Schultis had children of their own, so Samantha gained several stepsiblings.

There was a long and protracted family court process where both parents fought for custody of Kaleb and Samantha. For eight years, Mr. and Mrs. Shader shared custody of the children. Samantha would spend Sundays through Wednesdays with Mr. Shader and Laurie, and the other half the week with Mrs. Shader and Ron.

During this formative developmental period, Samantha was shuttled back and forth between her angry and bitter parents, who still had very divergent ways of parenting. She did not integrate a sense of belonging at either home. At Mrs. Shader's house she experienced abject neglect from her mother and violence from Kaleb. ██████████ ███████████████████████ She would lock herself in her room for days on end, and also leave the house for days at a time, leaving young Samantha to survive on her own. When Mrs. Shader was present, she had lax boundaries and related to her children more as a friend than a parent.

Conversely, Samantha's father was very structured, and her stepsiblings got much of his attention because they were better behaved. She was not allowed to miss school, even if she was sick. She had to do her homework and was disciplined for bad behavior. She was relegated as the "black sheep" of that family.

In addition to her parents' houses, Samantha would occasionally stay with her mother's sister, Abby Schweter. Aunt Abby was eight years younger than Mrs. Shader and the sisters had a volatile relationship. Samantha would go to Aunt Abby's house when she was fighting with her parents or seeking safety from Kaleb. Similar to Mrs. Shader, Abby related to Samantha more as a peer than a parent, especially because she was very young. Samantha and Abby's relationship resembled more of a friendship than that of an aunt-niece.

For example, when Samantha was just ten years old, ███████████████ ████████████████████████████████████ Samantha was too young to learn about her aunt's trauma; it was very frightening to her and complicated her impressions of the police.

***Struggles in school***

The stress of Samantha's home life understandably took a toll on her performance in school. At age nine, Samantha was evaluated for a learning disability. Her fourth-grade teacher noticed that she had trouble completing assignments and was worried about her cognitive functioning.

8



Instead, it was determined that Samantha's academic struggles were attributed to her troubled home life, and to improve her academic performance she needed counseling—both individual and family therapy. According to the psychologist, "Samantha would be an excellent candidate for counseling on an individual basis because she has good insight for a child her age."

Samantha did not need a tutor. She did not need an individualized education plan with special education coursework. Samantha needed emotional support, stability and to feel safe. She received none of this.

**B. Adolescence**

As Samantha entered adolescence, she continued to navigate her difficult living situations and family dynamics. At her mother's house she continued to experience little to no structure, accountability or rules. Her friends—both boys and girls—were allowed to sleep over. She started experimenting with illicit substance by smoking pot and drinking alcohol. ████████ ██████████████████████████████████████████████████ continued and their relationship became increasingly strained.

---

[2] Olexa, L. 2002. Psychological Evaluation of Samantha Shader.
[3] Olexa, L. 2002. Psychological Evaluation of Samantha Shader.

9

Conversely, Samantha's father was ambivalent towards her. She struggled in school and did not get good grades while her stepsisters exceled, so they received his attention and positive affection. She remembered sitting around the dinner table while they were given laptops as their rewards for good grades and attendance, while she got scolded.

Samantha's stepsisters were more conservative in manner and dress, while Sam marched to the beat of her own drum—by dyeing her hair bright colors, for example—and her father disapproved. Although she had good relationships with her stepsiblings, she could not help but feel some sadness and resentment because they received her father's love full-time while she was shuttled back and forth. She didn't quite fit in anywhere.

When juxtaposed, the parallel yet divergent experiences of Samantha and her stepsisters—particularly Samantha Schultis—paint a powerful picture. Samantha Shader, shuttled back and forth between the homes of her battling parents; violence and mayhem at mom's, feeling like a black sheep at dad's and constantly being scolded for struggling in school and not fitting in. In contrast, Samantha Schultis had the safe and stable home life to set her up for success. Her mom Laurie and Mr. Shader required her to participate in at least one team sport every year, and she was not allowed to quit so as to learn the value of commitment and accountability. Samantha Schultis repeatedly won awards for her perfect school attendance. She graduated high school and went on to study Criminal Justice Studies at Touro College. Samantha Shader felt like the failure, the outcast, who belonged nowhere.

### Family court battle

Mr. and Mrs. Shader were embroiled in tense family court proceedings regarding custody, separation and divorce for approximately eight years. There were tense hearings with witness testimony, family psychological evaluations, and a protracted back-and-forth battle between the parents.

When Samantha was fourteen years old, Mr. Shader found a picture of her and Mrs. Shader and what appears to be a marijuana cigarette. He knew that Mrs. Shader was lax with Samantha—she allowed friends to sleep over for days on end with little to no supervision. Other family members—including Mrs. Shader herself—corroborate her lenient and unstructured parenting style, although she rejects assertions of criticism about the lasting impact of her parenting.

Mr. Shader persuaded Samantha to testify in family court against her mother so that she could live with him full time. She agreed and did so, but then a few weeks later felt bad for her mother and asked the judge if she could take back her statement, but the judge did not allow it. Samantha had been burdened with the impossible task of trying to earn the love and respect of her parents by denouncing the other, which left her feeling unworthy and unaccepted by both.

### Substance abuse begins

Samantha started drinking alcohol and smoking marijuana at thirteen years old. She started drinking whenever she could, sneaking alcohol from adults and friends. By the time she was fifteen, she was drinking nearly every day.

Samantha was exceptionally primed to abuse drugs due to her alternating between severely abusive and alienating homes, struggles in school and friendships with drug-abusing peers, which are all linked to adolescent drug use.[4]

Samantha's adverse childhood experiences also set the stage for adult chemical dependency. Childhood experiences related to adult substance abuse include: "emotional and physical abuse/neglect… family dysfunction such as parental separation or divorce… parental substance abuse, and larger family size."[5] Due to circumstances outside of her control, Samantha was at increased risk of becoming addicted to substances.

The effects of drug and alcohol on the rapidly developing adolescent brain are well documented. Cognitive deficits resulting from drug and alcohol use "have potentially harmful implications for subsequent academic, occupational, and social functioning extending into adulthood."[6] In particular, the prefrontal cortex—which is associated with long-term planning, consequential thinking and impulse control[7]—is found to be smaller in adolescents, particularly females, who drink more heavily than those who do not.[8]

Samantha turned to substances as a way to seek relief from the trauma of her young life. Sadly, the trauma would evolve into tragedies, and her substance abuse escalated.

### The death of her best friend, Evan Wisniewski, and the onset of severe drug use
One the night of June 14, 2008, while Samantha was staying with her mother, her best friend Evan was sleeping over. It was common for Evan to sleep at Samantha's house; the two best friends were very close. They had met in middle school and became fast friends. In high school they were both in the alternative education track. Samantha was fourteen and Evan was fifteen.

---

[4] Henry, K. L. (2008). Low prosocial attachment, involvement with drug-using peers, and adolescent drug use: A longitudinal examination of mediational mechanisms. *Psychology of Addictive Behaviors,* 22(2), 302-308.

[5] Arteaga, I., Chen, C., & Reynolds, A.J. 2010. Childhood predictors of adult onset substance abuse. *Child and Youth Services Review.* 32(8), 1108-1120. Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC5115879/.

[6] Squeglia, L.M., Jacobus, J. & Tapert, S.F. 2009. The Influence of Substance Use on Adolescent Brain Development. *Clinical EEG and Neuroscience.* 40(1), 31-38.

[7] Dr. Joette James, June 4, 2017. The Adolescent Brain, National Conference for National Association of Sentencing Advocates and Mitigation Specialists.

[8] Squeglia, L.M., Jacobus, J. & Tapert, S.F. 2009. The Influence of Substance Use on Adolescent Brain Development. *Clinical EEG and Neuroscience.* 40(1), 31-38.



**Evan Marshall Wisniewski**

SAUGERTIES — Evan Marshall Wisniewski of Latham Circle, a freshman at Saugerties Junior-Senior High School who played with the Yankees in the Bebe Ruth League, died at Benedictine Hospital in Kingston on Saturday, June 14, 2008. He was 16.

Evan was an avid gardener and enjoyed riding and repairing all-terrain vehicles. He also had a talent for video and photography, and was an active body builder.

He was born in Kingston on Feb. 24, 1993, the son of Gary Theodore Wisniewski and Christine Kebil Summers.

In addition to his mother and father, he is survived by his mother's companion, Alexander Morris; his stepmother, Patricia Wisniewski; maternal grandparents Eve and Marshall Baer of Mount Tremper, John Kebil of Saugerties, Elena Zang and Alan Hoffman of Woodstock; paternal grandparents Susan and Vincent Gabriele of Merrick, Long Island, and Geraldine Howley of Agoura, Calif.; three brothers, Eli of Saugerties, Theodore "Theo" Wisniewski of Edgewater, N.J., and Brian Howley of Saugerties; two sisters, Cheynne Baer of Catskill and Mallory Cairo of Boiceville; and several aunts, uncles, and cousins.

The funeral will take place at 10 a.m. Thursday at St. Mary of the Snow Roman Catholic Church, Cedar Street, Saugerties. Burial will follow in Mountain View Cemetery, Saugerties. Funeral arrangements are by Seamon Wiley Funeral Home, John and Lafayette streets, Saugerties.

At around two o'clock in the morning, Evan received a text from his then twenty-four-year-old girlfriend. She told Evan that her ex-boyfriend had come over and beat her up, and he ran to her aid. When he arrived at her house, the ex-boyfriend had gone.

Later that night, Evan's girlfriend, Lindsay Latourette, gave him a lethal dose of methadone, and he died. Ms. Latourette would later be convicted of criminally negligent homicide, rape and criminal sale of a controlled substance. She served more than two years in prison.[9]

The death of Samantha's best friend had a profound psychological and emotional impact on her. Besides Ms. Latourette, Samantha was the last person to see Evan alive, and she was with him just hours before he died. Samantha harbored tremendous guilt about his death, and beat herself up for not convincing him to stay with her that night. It was the first time she experienced grief; unending, heart wrenching grief. She loved Evan. At only fourteen years old, she confronted the fragility of life and experienced a loss that felt like the ultimate abandonment.

Samantha asked her mom for help. She remembered pleading, "I'm really having a hard time with this; I really need help." Mrs. Shader took Samantha to her medical doctor, who prescribed Samantha Zoloft, an antidepressant. Samantha was upset; she did not want to take medication. She pleaded with her doctor: "You don't understand, I need help, I don't know what to do with myself." She did not know what exactly she needed—she was only fifteen—but she knew she did not want to take medication. She ended up flushing the Zoloft down the toilet and was never given therapy or grief counseling.

Samantha instead self-medicated with alcohol and marijuana, often binge drinking. According to Dr. Katherine Pruzan's report, enclosed as Exhibit A,

Exhibit A at 2.

### Juvenile arrest and probation

The months following Evan's death were full of grief and turmoil. Samantha started running away from home, spending time at friends' houses or on the streets. Not only was she in immense emotional pain; she was also navigating an intensely abusive home life. Kaleb's violent

---

[9] Doxey, P. October 25, 2012. Lindsay Latourette, convicted in drug death of teen Evan Wisniewski, released from prison, must register as a sex offender. *The Daily Freeman*. Retrieved from: https://www.dailyfreeman.com/news/lindsey-latourette-convicted-in-drug-death-of-teen-evan-wisniewski-released-from-prison-must-register/article_f4bd086a-c821-52ac-ab3c-49bbeff4b045.html.

abuse continued and instead of intervening to stop it, Mrs. Shader blamed Samantha and told her to endure it because he was "special." Samantha began resenting her mother for ignoring her needs and personal safety at the expense of Kaleb's ego.

Just six months after the death of her best friend, at fifteen years old, Samantha and her friend were arrested for stealing alcohol from a bar at Horses in the Sun (HITS), a traveling horse show that brings Saugerties a lot of income and press. Samantha's friend went to her mother's house with alcohol he had stolen from the HITS bar. They began drinking heavily, and the friend suggested they go back to the bar and steal some more alcohol. Samantha and her friend were arrested after stealing approximately six bottles of liquor, two cases of beer and a Rubbermaid cooler.

Following the arrest and on her own volition, Samantha approached the owner of the bar and apologized for her behavior and offered to work to pay off the costs. The owner declined. Instead, Samantha was prosecuted in juvenile court and sentenced to one-year of supervision under the Ulster County Department of Probation.

Life at Samantha's mother's house continued to worsen and the physical abuse extended beyond Kaleb. Just two months after Samantha's arrest, she ran away from home after her mother severely beat her. She checked herself into Family House of Woodstock, a home for runaway teens. Sam stayed for about a week, and then decided to move in with her father, stepmother Laurie, and step-siblings full-time.

According to Ulster County Probation Officer Marsha McCabe's notes, Mr. Shader felt that probation was having a positive impact on Samantha and helping her make good choices.[10] A letter from Samantha's school confirms her positive progress, stating:

---

[10] McCabe, M. March 20, 2009. Case notes re: Samantha Shader.

**Re:** Current Performance Status

**Student:** Samantha Shader

**Program:** 9th -10th Grade Alternate Education

**Date:** Thursday January 8, 2009

Status:

Overall, Samantha continues to do well academically and behaviorally. After a two week stint of challenges and adjustments which included absences and suspensions, Samantha now leads the program on all levels. She continues to excel by maintaining a 3.75 average and keeping a clean behavioral record. In November 2008, Samantha made a drastic change emotionally. Her attitude became extremely positive as she came to school on a daily basis while remaining conscious of grades, behavior and doing the right thing.

The Alternate Education Team recently met with Samantha. The team of six instructors came to a unanimous consensus that Samantha stands as the top student in the program. Samantha always does more than asked and consistently helps others. She is truly a pleasure to have in the program. In addition, the team will be recommending her for mainstream courses at her upcoming annual review.

Regards,

Edward Hasbrouck
Special Education Teacher / Case Manager

### *Medical neglect and back injury*

About six months into Samantha's term of probation, she attended her aunt Abby's Memorial Day weekend celebration. Abby's friends were all in their twenties and thirties, and Sam was only sixteen years old. Drugs and alcohol were readily available at the party, and Samantha drank heavily.

While under the influence of alcohol, Samantha got into a terrible accident while riding on an all-terrain vehicle (ATV). She was thrown from the vehicle and over a cliff. Samantha laid in bed in excruciating pain, pleading with her aunt to take her to the hospital. She recalls telling Abby, "This is really bad, I need to see a doctor" and remembers her aunt screaming at her, telling her she was being dramatic. Abby ignored Samantha's pleas for medical attention and instead gave her prescription pain medications.

It took three days of pleading through suffering and pain for Abby to take Samantha to Duchess County Hospital. It turns out Samantha had broken her spine and fractured her skull. She wore a back brace for several months. Samantha's mother attempted to file neglect charges against her sister, although the charges went nowhere.

Although Aunt Abby loved Samantha, she was another person who failed to keep her safe. She was another adult who related to Samantha as a friend, rather than a responsible caregiver or role model. After providing alcohol and drugs to underage Samantha and neglecting

14

to bring her to a hospital immediately after a serious injury, Abby was yet another person who failed Samantha.

***Samantha's last months in Saugerties***

       After her accident, Samantha moved out of her father's house and returned to her mom. She was too ashamed to face her father when he learned that she had been drinking at her aunt's house. Samantha knew he would be outraged with her.

       According to Probation Officer Marsha McCabe's notes, just two weeks after Samantha's accident, she called her father to wish him a happy Father's Day and he did not answer the phone or call her back. Samantha was right; her father was disappointed with her. But it was more than just disappointment—it was disownment. Mr. Shader did not speak to Samantha for years.

       Living with Mrs. Shader was not the right choice for Samantha. Their relationship was volatile, and her mother's mental health issues impacted her ability to resolve conflict in a productive way. Samantha's home life was "like something you saw on T.V….Mom was a disaster, doing her own thing... Kaleb running in and out whenever he wanted, violent and out of control."[11]

       Samantha continued running away from home, spending nights sleeping on the streets and missing school because she was so exhausted. Samantha would attend just enough classes to avoid dropping out; usually she would attend her afternoon classes at the local Boards of Cooperative Educational Services (BOCES) where she developed a talent for welding.

       In October 2009, Samantha again ran away from her mother's house. She fled to the Family House of Woodstock, a runaway shelter for youth in Ulster County. She informed her probation officer that her mother threatened to "make her bleed"[12] and though PO McCabe filed a report of suspected child abuse with Child Protective Services a case was never opened. Samantha asked if she could move in with her aunt, but her probation officer prohibited it and recommended she return to Family House, the residence for runaway children where she previously stayed.

       Samantha complied and stayed at Family House for one week. According to records, the program noted positive relationships with staff and peers, but struggled with addressing issues with her family relationships. She was discharged to her grandmother's house, but eventually moved back in with her mother.

       Samantha lived at grandma's house for a few months, and although it was a peaceful and quiet environment, she again returned to her mother. Although their relationship was volatile, they had reconciled and Samantha just wanted to return "home," which PO McCabe approved. Eventually, Sam's probation case closed successfully on January 11, 2010.

---

[11] Shader, S. Personal communication, April 23, 2021.
[12] McCabe, M. October 22, 2009. Case notes re: Samantha Shader.

***Rainbow Gathering,*** ▮▮▮▮▮▮▮▮ ***and running away for good***

     In July 2010, when Samantha was seventeen years old, she attended a Rainbow Gathering with her aunt Abby. Rainbow Gatherings are month-long, loosely organized outdoor congregations of people who can be characterized as travelers or hippies. Music and drugs are a big part of the Rainbow Gathering culture. Unfortunately, violence has been reported at these gatherings as well.[13] ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

     Abby ended up leaving the Rainbow Gathering without Samantha, who stayed behind with a young man she just met at the festival. Seventeen years old and alone, ▮▮▮▮▮▮▮



Exhibit B. at 6.

▮▮▮▮▮▮▮▮▮▮▮ including law enforcement. In that moment, they decided to run away together.

## C. Samantha's Decade as a Transient, Homeless Youth

▮▮▮ There is something poignant and tragic that in the aftermath of the horrific trauma, she sought safety and refuge by running away from her family, not towards them. Samantha's decision to run away shows how little she expected to be cared for or protected had she returned home. ▮▮▮▮▮▮▮▮

     Although Samantha fled the abuse and chaos of her childhood home, she unknowingly ran towards more danger.

---

[13] Wyler, G. June 24, 2014. The Dark Side of the Rainbow Gathering. *Vice Magazine*. Retrieved from: https://www.vice.com/en/article/gq8dy4/the-dark-side-of-the-rainbow-gathering.

***First attempt to run away***

When Samantha did not return home from the Rainbow Gathering, her mother called the police to file a report. Since Samantha was a minor at the time, the Saugerties Police Department contacted the FBI to file an America's Missing: Broadcast Emergency Response Alert (AMBER).

Very shortly after Samantha ran away, law enforcement located her in Iowa. She was held in a juvenile detention center for about two weeks before she was transported back to New York.

Not even a month later, in August 2010. Samantha ran away again. This time, nobody found her. She turned eighteen in March 2011, and there was no legal mechanism to bring her home. Over the next ten years Samantha only returned home a handful of times—sometimes during times of tragedy, sometimes in support of family members.

***"Dirty kids"***

There is a community of homeless, transient youth who ride trains around the country. This community of self-identified "dirty kids" called to Samantha because they too came from broken homes or dysfunctional families. Like Samantha, they were: "pushed into homelessness due to multifaceted sets of circumstances which include a combination of factors such as family conflict and dysfunction, abuse, victimization, neglect, and economic hardship."[14] They were kids like her; seeking comfort and love from strangers because they were not receiving it at home. According to an article from California Sunday Magazine:

"Statistically speaking, the path for Dirty Kids isn't promising. The death rate for homeless youth under 25 in San Francisco [where Samantha lived for several months in 2012-2013] is ten times greater than the state's general youth population. Talk to Dirty Kids and they'll tell you about losing friends to overdoses or car wrecks, about addictions and being narrowly revived by an emergency Narcan injection to counteract a heroin overdose."[15]

The "dirty kids" with whom Samantha traveled were a loose association of troubled young people who sought community and love among one another. Although they had developed a survival system, they are a culture, not an organization. In fact, it is the consistent disorganization and instability in their lives that allows them to relate to one another.

***Height of drug abuse and addiction***

Samantha's time traveling across the country was volatile and full of highs and lows. On the one hand, Samantha made some friends who were crucial, lifesaving supports. She saw and experienced much of the country. She sat on top of a train as it wound through the corn fields of Iowa. She learned how to play the ukulele and guitar very well. She adopted two dogs: Bonner and Susie Q (short for Susan Sarandon), who became her family.  "There were parts of traveling that were really beautiful,"[16] Samantha said.

---

[14] Stablein, T. & Schad, L. (2019). Contemporary American Transience: Nomadism and the Rationale for Travel among Homeless Youth and Young Adults. *Qualitative Sociology.* 42, 455-477.

[15] Smiley, L. et. al. June 28, 2016. "The Runaways: On the road with homeless youth." *The California Sunday Magazine.* Retrieved from: https://story.californiasunday.com/homeless-the-runaways.

[16] Shader, S. Personal communication, December 29, 2020.

But life as a transient, homeless young person exposed Samantha to more drugs and a community of people who both used and provided access to them. Samantha started experimenting with harder drugs. At first she was drinking alcohol and smoking marijuana every day. Then she transitioned to heroin, methamphetamine, crack cocaine, hallucinogenic mushrooms and fentanyl, all the while constantly drinking alcohol and smoking marijuana.

Samantha's days were centered around obtaining and using drugs. She and her friends would play music on the side of the road to make money to score. If she was not high, she was finding ways to get high. Eventually, Samantha developed a serious addiction to heroin and at the height of her addiction was shooting up all day, every day. She injected the drug all over her body to the point where her veins were damaged and retracted. Addiction often drives unsafe behavior. The motivation to procure drugs and its subsequent neurological impacts make it difficult to make good decisions. For example, Samantha recalled being so addicted to heroin that she asked a friend of hers to inject her in the neck while she drove a car.

At the height of Samantha's addiction, she actively sought out fentanyl because it was more affordable. Fentanyl is extremely dangerous and is the cause of thousands of accidental overdose deaths each year. But for Samantha it was the cheaper alternative to getting high, something she needed and depended on, something that had become the focus of her life.

Over the course of her traveling, Samantha accidentally overdosed countless times. She was administered Narcan approximately twenty times, by friends, strangers and medical professionals. She has woken up in hospitals, ambulances and on the street, unaware of how she got there.

Samantha's criminal history is a clear and documented representation of her drug addiction; the charges were directly related to her drug use, such as drug possession, or a result of her addiction such as petit larceny.

***Victimized by violence***

While homeless and on the road, Samantha endured relentless violence at the hands of strangers and romantic partners. Her childhood of trauma and physical abuse was playing out in young adulthood. She was still without a true home, a place of safety and refuge, a place to return for support and love after being hurt.

Just months after Samantha left Saugerties for good, she found herself in Oregon at a gathering with dozens of traveling kids. People were drinking, using drugs, making conversation and playing music. Samantha was engaging in conversation with a group of people when she was attacked by a man in the group. He pinned her to the ground on her stomach, pulled her head back by her hair and held a knife to her throat, yelling "I'm going to saw your head off!" A stranger in the group intervened and shoved the man off of Samantha's back. The next day, the man apologized to Samantha and gave her a beer. All was forgiven, and they shared a conversation before going their separate ways.

This horrifying story captures so much of Samantha's story: her subjugation to unpredictable violence, lack of protection and safety, and dissociation to trauma led her to

18

quickly and easily forgive a man who almost killed her just hours before. Samantha learned how to turn off her feelings, dissociate, which is also known as the "freeze" response in "fight, flight or freeze" trauma responses: "Dissociation enables (or causes) detachment from anticipated feelings of fear, pain and helplessness."[17] Samantha's traumatic past primed her for this dangerous lifestyle, which over and over again nearly cost Samantha her life.

Samantha entered into romantic partnerships with men who were abusive and violent. Her childhood abuse and trauma, as well as the lack of present and healthy adult relationships primed her to seek out situations that were violent and unstable. She reflected, "There's just so much of it [domestic violence] that I'm kind of desensitized to it."[18] This psychological phenomenon called "repeated victimization" is linked to people "with histories of prolonged childhood abuse. Widespread epidemiological studies provide strong evidence that survivors of childhood abuse are at increased risk for repeated harm in adult life. For example, the risk of rape, sexual harassment and battering, though very high for all women, is approximately doubled for survivors of childhood sexual abuse."[19]

When Samantha was eighteen years old, her boyfriend Jay injected her with heroin and laughed, saying he had purposely given her Hepatitis C. When she was twenty years old, the same boyfriend broke Samantha's leg. He stepped on her ankle with all of his weight and snapped it. Jay was also emotionally abusive and manipulative; for example, rather than supporting Samantha through the grief of her close friend's death, Jay told her he was happy the friend died because he used to worry they had romantic feelings for one another. On another occasion, he threatened to take his own life in front of Samantha by holding a knife to his throat. She tried to stop him from cutting himself but he slashed her hand. She was taken to the hospital for stiches for the injury.

Samantha's most serious and recent relationship was with Henry Chmielinski, who she met while traveling. On multiple occasions, Henry was violent and abusive towards Samantha. He physically beat her and knocked out her front tooth. She now has a fake front tooth. After the violent outburst when he knocked out her tooth, he told her it was an accident, so as to raise doubts about his intent to harm her and absolve him of responsibility. Just a few months before Samantha's arrest, he wrapped his hands around her neck and choked her, then began hitting her with his belt. They broke up after that incident and have not seen each other since.

### *Violence at the hands of police*
In addition to the violence she endured at the hands of family, strangers and intimate partners, Samantha has experienced violence at the hands of police. Life as a homeless youth placed her and other homeless youth in vulnerable situations with police.

In Knoxville, Tennessee in 2012, two police officers physically beat Samantha in a Walgreens parking lot after she had already been assaulted in the store by a man who thought she

---

[17] Bremmer, J.D., & Marmar, C.R. (1998). *Trauma, Memory and Dissociation.* American Psychiatric Press.
[18] Shader, S. Personal communication. January 20, 2021.
[19] Herman, J. (1992). Complex PTSD: A syndrome in survivors of prolonged and repeated trauma. *Journal of Traumatic Stress.* 5(3), 377-391.

was stealing beer—she did not steal beer. After the cops were done punching and kicking her, they told her she had gotten "a good old fashioned Tennessee [sic] whooping."[20]

On another occasion, a cop picked up Samantha and two friends who were hitchhiking in Louisiana and gave them a ride to the Mississippi border. When they arrived at the border, the cop accused the kids of stealing patches on his jacket; Samantha was in the front seat, unaware of what her friends were doing in the back. After he let the kids out of the car, he beat them up severely and left them on the side of the road. The kids did not fight back; they were frightened and hurt.

Samantha also recalled being beat by a female cop in a parking lot after calling them to help break up a party in a motel. She had drunk so much alcohol she cannot remember how the assault started, but recalled gaining consciousness in the motel parking lot, getting hit by the cop. These incidents left her feeling confused about where she could seek out safety when she herself was victimized.

### Tenuous family connections

During Samantha's transient years, she maintained limited, sporadic contact with her family. She was primarily in touch with her sister Darian, her aunt Abby and her mom. Occasionally her mom or aunt would figure out where she was and order her pizza, just so they knew she had something to eat that night. Only on a handful of occasions did she speak to her father. Mr. Shader told Samantha that she could come home to him whenever she was ready to get clean and make a change in her life.

On several occasions, Samantha would return home to family. Sometimes she would come home in an attempt to get clean, other times to share in milestones like her aunt's indie movie premiere or her cousin's piano concert.

Samantha would return home to deal with tragedies too. About three years after she ran away, a family member called her with horrific news. The family member learned that her husband had ██████████████████████████ with whom Samantha was very close. Samantha was living in California at the time; she dropped everything she was doing and drove back to New York to briefly stay with that family.[21]

Samantha was told by her family member that they could not pursue charges against the abuser because the victim was not old enough to make a statement. Samantha believed this to be true for years. When Samantha got older she realized this must not be the truth. She wondered why the lied and why the family never pressed charges.

Samantha would call her sister Darian to talk about personal issues, like her struggle with drugs or relationship troubles. On several occasions, these conversations worried Darian so much that she wished she could "put [Sam] somewhere safe to protect her."[22] One conversation in 2018 was so concerning that Darian convinced her mother that they needed to go find Samantha

---

[20] Shader, S. Personal communication, April 19, 2021.

[21] The name of the victim and family member are purposely omitted due to the victim being a minor.

[22] Shader, D. Personal communication, February 4, 2021.

in New Orleans and bring her home. Mrs. Shader had also received a call from a fellow traveler saying Samantha had recently been hospitalized for overdosing on heroin. That same day, Darian and Mrs. Shader got in their car and headed to New Orleans.

They found Samantha in a run-down house and brought her home to Saugerties with her boyfriend at the time, Henry. They temporarily got off heroin and rented a house together in Connecticut. But after a while they relapsed and got "itchy feet" to travel again. Henry and Sam packed up and left for Denver where they returned into deep heroin use.

After ten years of homelessness, drug use and violence, Samantha decided she needed to make a change. She recalled how one day she woke up, went for a drive, and something inside her just clicked. Samantha remembered her father's offer: when she was ready to get clean, he would give her a place to stay and a job. On a highway outside of Denver, Samantha called her dad and he told her to come home. Right then and there, she turned her car around and drove home to Saugerties.

### D. Samantha's Return to Saugerties

After nearly a decade of sporadic contact with her father, Samantha came home to him. Mr. Shader made his rules very clear: she needed to work and stay off of drugs. And that is exactly what Samantha did.

### *Detoxifying from heroin and a toxic relationship*

The first few weeks being home were quite difficult. Samantha was in severe withdrawal from heroin but it did not stop her from working. Her father was in the process of clearing acres of dense woods on his property to make room for campgrounds, and he gave her a lot of tedious, manual labor to pass her days.

Mr. Shader vividly remembered how sick Samantha was when she first came home. He had tasked her with moving a pile of heavy rocks from one area of the property to another. These rocks were heavy and required a lot of strength. While walking back and forth across the land and carrying heavy rocks, Samantha frequently stopped to vomit, but she kept working. Samantha was determined to fight through her withdrawal and do what was asked of her. Slowly but surely she moved her mountain of rocks and fought through her withdrawal. She wanted to prove to her father, and to herself, that she could do it.

Samantha had come to Saugerties with her partner at the time, Henry. They lived together in a camper on Mr. Shader's property, working the land during the day and spending time with Mr. Shader, Ms. Schultis and other family members in the evening. Mr. Shader rarely let Samantha leave the property because he wanted her to avoid the temptation of using drugs, and she obliged. Henry, however, left the property one night and when he returned got into a fight with Mr. Shader, who threatened to kick him off his property for good.

Eventually, Mr. Shader did kick Henry off his property. The night before Thanksgiving 2019, Samantha ran to her father's camper, distressed and upset. She and Henry had gotten into a fight. Henry grabbed Samantha's neck and choked her. She tried to fight back, but he cornered

her in the kitchen of their trailer, where he stood over her and started removing his belt. At this point, Samantha began fearing for her life. Henry began whipping her. Eventually she caught the belt, tried to fight back, and fled the trailer. He chased her around her father's property until she made it safely to her father's trailer.

Mr. Shader marched over to Samantha's camper and told Henry to get off his property. Though Samantha has since remained in touch with Henry, they haven't seen each other since that night. And although their relationship was wrought with violence, Samantha still mourned the loss of the relationship.

### Struggles with alcohol and marijuana

Although Samantha was able to successfully work through her serious heroin addiction, she continued to smoke marijuana and drank a staggering amount of alcohol. She would wake up in the morning and drink tall boys of Twisted Teas and alcoholic seltzer ("hard seltzer"), then continue throughout the day drinking vodka, beer and more hard seltzers. She would also smoke marijuana every day. Her father tried to get her to stop, and her uncle—a certified substance abuse counselor—offered for her to join his drug counseling groups, but she continued to struggle with drinking and smoking.

Samantha took active steps to work on her addiction. She was no longer using the harshest drugs—heroin and fentanyl—nor any of the other drugs she had used in periods of addiction, like crack cocaine or methamphetamine. But she was still using substances to self-medicate her trauma. While drinking and smoking provided temporary relief from her pain, Samantha had not yet fully confronted the depths of her trauma, nor had she fully begun to heal. And tragedy continued to follow her.

### The death of her best friend, Michael Layshock

Returning home to Saugerties did not shield Samantha from more grief and loss. In February 2020, her best friend Michael Layshock died of a drug overdose. The two met as homeless traveling kids when Samantha was seventeen years old, and stayed close through the years. Samantha took the loss of her best friend extremely hard. She leaned on her family for support and mourned with their surviving friends.

Notably, Samantha did not relapse back into heroin use. Given the depths of her pain, this indicated the strength of her own resolve and her utilization of other supports. Although she was still drinking heavily and smoking marijuana, she did not spiral out of control like she had in the past.

### The murder of George Floyd, subsequent protests, and Samantha's arrest

On the days following May 25, 2020, the world watched in horror as video footage emerged showing a police officer murder a Black man named George Floyd. According to Samantha's loved ones, she was deeply impacted and heartbroken by his death. She cried when she watched the video of his death.

Samantha has both self-identified and been described by loved ones as a protector; she cannot stand to see vulnerable people exploited. For example, ███████████████

22

██████████████████████████ Her aunt Abby described how she stood up for Vaughan when people made fun of him, and does the same for anyone who has a developmental disability or mental illness.

George Floyd's murder felt to Samantha like the ultimate victimization. In Mr. Floyd she saw herself, her cousin, her traveling companions, her aunt Abby; people who had been bullied, beaten, or abused by the police.

Samantha's own personal history of victimization and neglect at the hands of police was activated through the murder of George Floyd. Although she had positive interactions with police, including Sergeant Castagnola and Officer Syd Mills of the Saugerties police department, she too was harmed by police—either physically, or by internalizing that they would not keep her safe when called in times of need.

These personal accounts of police violence affected Samantha's view of police, but they notably did not engender in her an opinion that all police officers were bad. She fondly remembered Sgt. Castagnola and Officer Syd Mills from Saugerties and had very positive things to say about each. Both remember Samantha and hope she can use her current experience in jail to better herself. Sgt. Castagnola expressed to her legal team how she is in his thoughts and prayers, and while he was hurt that she made the choices that led her to be arrested, he hoped she can make the most out of this situation and still cares very much about her.

Amidst all her intense feelings and emotions, while continuing to use substances, Samantha made the decision to travel to New York City to protest Mr. Floyd's murder.



Exhibit B at 7.

Since her arrest and subsequent incarceration, Samantha has worked incredibly hard to unpack how her entire life culminated in her decision to attend the protests. It has been no small feat, but Samantha has been brave, humble and thoughtful throughout her journey to discover who she really is, and who she wants to be.

## II.     OFFENSE CONDUCT

Samantha Shader's actions on May 29, 2020 endangered the safety of NYPD law enforcement attempting to keep peace and restore order to a chaotic and emotionally charged

protest. Her actions also endangered the safety of those protesting alongside her and other civilians. Ms. Shader's behavior was reckless, dangerous and could have resulted in a far more destructive outcome. But when Ms. Shader arrived in Brooklyn to protest the murder of George Floyd, she did not come with the intention or plan to harm law enforcement.[23] Her lack of premeditation does not excuse or justify the scope of the harm that she could have inflicted had the device she thrown worked as intended. But, her lack of premeditation does provide further insight into the context of how Ms. Shader ended up before this Court charged with these crimes for which she stands before it for sentencing.

### A. Samantha Shader Has No Political Affiliations That Spurred Her Desire to Attend the Protest

Samantha Shader's participation in the 2020 protests in response to George Floyd's murder did not stem from any political affiliation or association with a violent anarchist group. Ms. Shader is not a member of any political organization and has not engaged in any organized efforts to support a political organization because of a political affiliation. Her decision to attend the protest in Brooklyn in May 2020, like thousands of others, was in reaction to the murder and tragic death of George Floyd. Spurred by the shock and deeply rooted frustration with seeing police violence against communities of color, Ms. Shader came to New York City to protest that violence and the failure to hold accountable the officers who perpetuate that violence. She did not come to New York City with the intention to attack officers or to promote anarchy. Her only plan was to protest the harm caused by bad actors violating their oath to protect communities.

In the summer of 2020 during protests surrounding the murder of George Floyd, by convicted killer and former Minneapolis police officer Derek Chauvin, former President Donald Trump condemned the outrage of protestors, blaming them for the violence that erupted in the streets in the days following the murder of Mr. Floyd. The previous administration labeled groups of protestors "terrorists", blaming them for the violence and chaos of the protests taking place around the country. In doing so, individual protestors were swept into groups attempting to use the protests as an opportunity to undermine and overthrow the government, rather than being seen as individual actors whose only plan in attending protests was to express their outrage with the individual corrupt actors committing atrocities against communities.[24]

Samantha Shader is not and has never been a member of any premeditated or organized effort to dismantle or undermine the government. It is inconsistent with her personal history and none of the evidence supports this. A review of Ms. Shader's social media presence not only fails to evince any indication of political affiliation but also fails to demonstrate any attempt at organizing followers for a cause or an agenda. Her social media activity reflects, consistent with her history, the life of a young woman who has experienced homelessness, struggled with substance abuse, and has a passion for music – both as musician and an avid listener. Prior to the events of May 2020, her posts illustrate a frustration with violence inflicted by members of law

---

[23] *See* PSR ¶ 15 ("It is noted that the instant offense does not meet the threshold to qualify as a crime of terrorism. There is no evidence suggesting that Shader went to the protest intending to create or utilize a Molotov cocktail.").

[24] Various groups on both the far left and far right took advantage of protests to create chaos and violence to promote their own agendas. *See* https://www.ft.com/content/04ba905f-f965-4f7b-80ab-cccb0f912ddc.

enforcement against communities of color, the disparate treatment of Black Americans by police officers and the support of peaceful protests against the type of police violence that led to the murder of George Floyd.

### B.  Ms. Shaders Behavior Leading Up to the Crime Evinces a Lack of Premeditation of the Offense

Samantha Shader's actions that night were not the result of any premeditated plan to perpetuate acts of violence against law enforcement. Her actions were spontaneous, unplanned and a product of poor decision making amidst a chaotic and emotional night.

Nothing in Ms. Shader's communications, social media or in her actions prior to arriving at the protest demonstrate a premeditated plan to harm police or engage in violence during the protest. Ms. Shader's social media posts prior to making the trip to New York City discuss traveling to the protest, bringing masks, and milk of magnesia in case anyone gets pepper sprayed. There are no communications about bringing tools to attack the police, fashioning a weapon or otherwise about acting out in violence. When Samantha asks Tim Amerman whether he wants to head to New York City to "cause some hell,"[25] what is missing from these statements is any indication of a planned effort to hurt the police. Her statement is reflective of her upset and misguided desire to push for change through recklessness and property destruction. Before Samantha headed to New York City, her plan consisted of gathering items she might need during the protest, and while some of those items (the bottles, hammer) were tools intended to cause property damage, none were prepared to make a weapon or explosive and none were intended to be used to harm police or anyone else. Tim Amerman's statements to the police support, not counter, this fact.[26]

The note from Mr. Amerman found in the vehicle Ms. Shader drove to meet a friend on May 29, 2020 makes references to Mr. Amerman giving her glass bottles and masks. Mr. Amerman, during his post arrest interview, admitted to writing this note and providing Ms. Shader with paint, masks, rope, plastic baggies and marijuana.[27] He does not provide her with a lighter or incendiary fluid. He explicitly notes that he believed she would use the items to throw bottles and/or inflict property damage – not to create explosive devices, not to attempt to seriously injure or kill any officers. Mr. Amerman corroborates Ms. Shader's lack of planning or premeditation. Ms. Shader has no other communications with friends that illustrate any kind of plan, there is no indicia of a broader premeditated conspiracy to commit an act of violence against the police in any text messages, bank records, or social media – her actions were dangerous, but also impulsive and reckless.

---

[25] *See* Amerman Criminal Complaint ¶ 9.
[26] *See* PSR ¶ 12.
[27]  *See* Timothy Amerman Complaint and Affidavit in Support of Application for Arrest Warrant ¶ 21.

### C.  Samantha Shader Was Acting Impulsively in a Chaotic and Tumultuous Environment

Samantha Shader's history with substance abuse and alcoholism has long played a role in the most regrettable choices she has made in life – often resulting in interactions with the criminal justice system. In these interactions she has been both the accused or, herself, the victim of criminal behavior.

On the night of the events leading to her arrest Ms. Shader admits to being inebriated. Later when she was questioned she admitted to having drank a large quantity of alcohol. She is not proud of her ongoing struggles to maintain sobriety or the life altering consequences that are the result of her addiction. It undoubtedly played a role in her actions that night, compromised her judgement and, consistent with her history, led her to act out spontaneously and brazenly.

By the time she arrived at the protest near Eastern Parkway Ms. Shader was intoxicated and the scene was chaotic. Tension filled the streets as both law enforcement and protestors were on high  alert because of eruptions of violence in the days prior both around the country and in Brooklyn near the close-by Barclays Center.[28] Hours prior and just blocks away from where Ms. Shader was arrested, police were photographed spraying mace into a crowd of protestors.[29] Reports of police officers beating protestors, driving police vehicles into crowds and pointing guns filled news media with the same frequency as property damage and aggression on behalf of protestors against officers.[30] The scene on Eastern Parkway on May 29, 2020 was consistent with these reports. Body camera footage from that night depicts the tension and turmoil of the night that surrounded Ms. Shader.

---

[28] https://www.washingtonpost.com/nation/2020/05/29/george-floyd-minneapolis-protests-live-updates/ (describing acts of violence committed by both police and protestors alike in the days after the murder of George Floyd).
[29] https://theintercept.com/2020/06/02/new-york-police-protesters-george-floyd
[30] https://www.nytimes.com/2020/06/17/nyregion/nypd-leticia-james-hearing-protests.html;

### D.  Samantha Shader Received the Bottle at the Protest, She Had No Plan or Tools to Create the Device Before She Arrived

When she was interrogated by the police after her arrest, Ms. Shader explains where she obtained the bottle she is seen throwing at the police van – from several individuals at the protest. The video footage from that night depicts Ms. Shader holding the bottle and shortly before attempting to light the bottle, being approached by a man in a brown hooded sweatshirt. The criminal complaint describes this individual as appearing to "shield" Ms. Shader before she throws the bottle.[31]



From the video footage shortly before Ms. Shader threw the device, this man seems to have previously interacted with Ms. Shader and is not one of the individuals she traveled to New York City with—neither her sister nor Jeffrey Butler. While the video does not show where Ms. Shader retrieves the bottle from before holding it, it is notable that the man in the brown sweatshirt is seen with her immediately beforehand and nowhere present are any of the individuals with whom she traveled to New York City.

Shader_000837 - IMG_0190 at 00:10



SHADER_001977

Neither Mr. Butler nor Ms. Shader's sister appear to be near her when the bottle is thrown, further demonstration that this was not a previously discussed act. Mr. Butler later affirms on social media that despite traveling with Ms. Shader and her sister to New York City in one vehicle and being with Ms. Shader for much of the night prior to this incident, he never saw her in possession of a Molotov cocktail or anything fashioned to be an incendiary device or explosive.[32]

### E.  Ms. Shader's Subjective Belief that the Vehicle Was Empty

Ms. Shader threw the bottle after first calling attention to herself by screaming aloud. Yelling for people to move out of the way, she did not throw it at one of the many officers on foot walking nearby, on bikes or any passerby.

---

[31] *See* Samantha Shader Amended Criminal Complaint and Affidavit in Support ¶ 2.
[32] Mr. Butler makes similar statements in his letter addressed to the Court. *See* Character Letter from Jeffrey Butler, ECF No. 50.

During her interrogation, Ms. Shader tells police that she did not believe the van to be occupied – she believed that it was empty and had no intention of hurting anyone inside the van or throwing an object at a vehicle with officers inside.[33] Regardless of this belief, the fact remains that Ms. Shader was incorrect. There were officers in the car who could have been harmed and were endangered by her actions.

To better understand how Ms. Shader could have believed that the van was unoccupied at the time that she threw the device, it is important to understand what surrounded her at the time. The scene was loud and chaotic. There were lights and sirens in all directions. People were screaming and chanting. The crowd was volatile – protestors were yelling, some were engaged in violence and property destruction and officers were yelling, some engaged in acts of aggression to push back the crowd. Ms. Shader was highly intoxicated, disoriented, and primed by her trauma history to be disconnected from herself and her thoughts. She was caught up in the moment and this confluence of factors narrowed and constricted her vision and understanding.

Over the course of the day, Ms. Shader had consumed a vial containing a tincture of marijuana and Everclear which she used to keep withdrawal symptoms at bay, a 12-pack of White Claw, several Arctic Summer hard seltzers, some Twisted Tea hard iced teas, beer, a pint of vodka, and some margaritas that were being handed out for free at a bar on Flatbush Avenue. She was drunk and high by the time she turned onto Eastern Parkway. Also, twenty minutes prior to the incident Ms. Shader had been hit with a cloud of mace and had to have milk poured on her face and hair to quell the pain. She was not in a sober and discerning state of mind.



Intoxicated and dazed, Ms. Shader's tunnel vision was compounded by the external noise and chaos. As is evident from the videos that night, in the moments before Ms. Shader threw the bottle there were emergency vehicles all around her. Even in the narrow camera view of the video depicting the events leading up to the crime, it is clear that a fire truck with emergency lights flashing was driving eastbound on Eastern Parkway; an ambulance with emergency lights flashing was driving southbound on Washington Avenue; a police van with emergency lights flashing was driving westbound on Eastern Parkway; and numerous other police cars with emergency lights flashing were lined up along Eastern Parkway, none of which

---

[33] "I didn't make it myself and I didn't have another one. I [expletive] swear on anything. I didn't have another one and I didn't assemble it and I didn't even really want it and I don't know why I partook in it. And I thought that that  car was empty and I knew it was a bad idea and it was stupid." Samantha Shader's interrogation at 23:51:45.

were moving. Dismounted police officers were located along Eastern Parkway and in the intersection of Eastern Parkway and Washington Avenue, giving the impression that the police vans parked some distance away were empty. The police van at which Ms. Shader threw the device was parked next to the bike lane at the Southeast corner of Eastern Parkway and Washington Avenue, away from the main intersection and the dismounted officers. Its emergency lights were flashing, but, amidst the chaos and the violence and because of her own disorientation, she erroneously believed it to be empty.

When Ms. Shader is interrogated, she is told that the van was full of four officers. Her reaction during the interrogation is notable. The gravity of this statement hits home for her, and appears overwhelming, as she reacts by placing her head in her hands, crying, and whispering, almost inaudibly, "I can't believe there were four people in that car." Ms. Shader's interrogation at 23:46:47.[34] The import of that knowledge weighs on her heavily and her remorse is immediate and sincere. "I can't be any more thankful that it didn't incinerate four people and I'm horrified that there were people in the car period." *Id.* at 23:58:41. Ms. Shader expressed her shock and genuine regret to officers before she had any idea that her case would be brought in federal court or the severity of the consequences she faced because of her brazen and reckless actions. More than two years later, Ms. Shader comes before the Court ready to accept those consequences, unwavering in her deep regret for her crimes and having spent the past two years working diligently and consistently on her rehabilitation. She cannot undo her actions that night but she is making valiant efforts to turn her life around and demonstrate that she has the potential and the desire to be a far better person.

### F. Ms. Shader Used an Inoperable and Poorly Constructed Molotov Cocktail

***The evidence shows that the explosive device was not fully functional.***

Ms. Shader pled guilty to violating 18 U.S.C. § 844(i), which refers to the attempted use of "fire or an explosive" to cause property damage. The term "explosive" is defined in 18 U.S.C. § 232(5):

> The term "explosive or incendiary device" means (A) dynamite and all other forms of high explosives, (B) any explosive bomb, grenade, missile, or similar device, and (C) any incendiary bomb or grenade, fire bomb, or similar device, including any device which (i) consists of or includes a breakable container including a flammable liquid or compound, and a wick composed of any material which, when ignited, is capable of igniting such flammable liquid or compound, and (ii) can be carried or thrown by one individual acting alone.

18 U.S.C. § 232(5). As set forth in her plea colloquy, Ms. Shader believed the bottle she threw at the NYPD van was an explosive device, although her attempts to light it were unsuccessful and the bottle ultimately did not explode. The defense also concedes that the bottle used by Ms. Shader meets the definition of an explosive device in § 232(5).

Although the device Ms. Shader used meets the legal definition of an explosive device, it did not function as intended or cause fire to the NYPD van. To qualify as an "explosive or

---

[34] All discovery recordings or documents cited herein can be provided to the court upon request.

incendiary device" under § 232(5), "there need only be a potential for explosion." *United States v. Agrillo-Ladlad*, 675 F.2d 905, 913 (7th Cir. 1982). This occurs where the device includes "a group of components designed to spread and direct fire, with a source of ignition and no industrial application." *Id.* Thus, the device Ms. Shader used still qualifies as an explosive even though it was not fully functional. *See* ECF No. 51 (Gov. Sent. Ltr.) at 6, n.3 (citing *United States v. Sheehan*, 838 F.3d 109, 122 (2d. Cir. 2016) ("Even where a device . . . is defective in some way because not all of the parts are in place, the text of the statute is satisfied if the device has been designed (in an objective sense) in such a way that it can be easily converted into an effective explosive.").

***Ms. Shader's use of an explosive device with an ineffective container is further evidence of lack of premeditation.***

While the glass bottle thrown by Ms. Shader was indeed a breakable container under the definition of 18 U.S.C. § 232(5), the Bulleit bottle is constructed with very heavy thick glass walls and did not in fact break upon impact even when thrown. This differs from the other containers that were alleged to be in Ms. Shader's possession prior to her arrival in New York City – Tim Amerman tells law enforcement that he provided Ms. Shader with beer bottles that he anticipated that she would throw during the protest.

Someone with experience making incendiary devices, knowledge of how to construct them effectively, and a desire for it to explode on impact would have used a container that is more easily breakable, for instance the beer bottles, rather than something with an ineffectual design.

Using the Bulleit Bourbon bottle illustrates not just a lack of knowledge but also supports Ms. Shader's account of only having received the bottle at the protest and not traveling to New York City with the bottle. Mr. Amerman did not include this type of bottle among the bottles provided to her and tells law enforcement that he had not purchased that brand since years prior.[35]

Thus, while Ms. Shader believed she was throwing an operational Molotov cocktail, the bottle used was not an effective container for an explosive device.

***The bottle does not appear to have contained enough flammable or incendiary liquid to readily ignite.***

In order to qualify as an explosive or incendiary device, the device must contain a flammable liquid or compound. *See* § 232(5). The defense does not dispute that the bottle contained some liquid that Ms. Shader believed to be a flammable liquid or compound. The defense also does not dispute that a member of the NYPD who poured out the liquid thought it "smelled like acetone or nail polish remover." Gov. Sent. Ltr. at 3. Yet, when analyzed, the Bulleit bottle tested negative for the presence of an ignitable liquid. Indeed, when the bottle is initially encountered by law enforcement at the 71st precinct on May 30, 2020, while it is believed to have originally contained a liquid, that liquid is characterized as "an unknown liquid substance.[36]" The Evidence Collection Unit ("ECU") is told that the unknown substance was

---

[35] *See* Discovery Bates Stamped Shader_000989.
[36] *See* Discovery Bates Stamped Shader_001907.

disposed of on the scene but there is likely residue of the liquid in the bottle that could be examined at a later date.[37]

Approximately one week later, when the bottle is tested at the FBI Explosives Chemistry Laboratory, "a solvent extraction" is performed "followed by analysis with gas chromatography/mass spectrometry (GC/MS)."[38] The conclusion formed by the analysis is that "no ignitable liquid residues were identified on the inner surfaces of Item 1 [Clear Glass Bottle (1B43)]."[39]

Whatever liquid was inside the Bulleit bottle, it could hardly have been an amount sufficient to fuel an incendiary device, the singular image of the device in its most complete form shows a what visually appears to be an empty bottle topped with unsaturated material coming out of the top.[40] What's more, an image of the bottle immediately before it is thrown shows that at the very least it was not a liquid filled bottle, to the extent there is liquid inside it would be a small amount compared to the large capacity of the bottle; a choice the designer likely made intentionally.[41]

***Before throwing it, Ms. Shader unsuccessfully attempted to light the cloth in the bottle.***

The fact that Ms. Shader hastily threw the bottle after unsuccessfully trying to light the cloth inside it is further evidence of her lack of planning, knowledge, or premeditation. There is no dispute that Ms. Shader tried to light the cloth inside the bottle before throwing it. Yet, the evidence shows she threw the bottle without successfully lighting the wick. For example, when Ms. Shader admits to throwing the bottle at the police van during her interrogation she explains that it was not on fire. Corroborating her statement is the actual video that shows that the bottle was not on fire when it was thrown. And no fire resulted when the bottle strikes the NYPD van.[42]

Also absent is any evidence that burned or charred white material was recovered. It is unclear where the cloth present in the bottle at the time of the video of Ms. Shader throwing a bottle is after her arrest, whether or not it was collected, preserved or discarded.[43] This is significant because there is no evidence of a wick that was ignited.

Additionally, nothing about her history or the events of that night leading up to her throwing the bottle are consistent with Ms. Shader planning to use an explosive device against NYPD. Instead, the physical evidence, the social media evidence, her interrogation, and her history bear out a young woman with a complex history, caught up in the turmoil of an

---

[37] *Id.*

[38] *See* Discovery Bates Stamped Shader_000187

[39] *See* Discovery Bates Stamped Shader_000524: 1B43 in the report is identified as being visually similar to the Bulleit Bourbon bottle alleged to be the same bottle thrown by Ms. Shader.

[40] *See* Discovery Bates Stamped Shader_000110.

[41] *See* Discovery Bates Stamped Shader_837 IMG_0910 at 00:34.

[42] *See* Shader_000837 IMG_0190 at 00:34.

[43] An ESU report makes reference to a crew using "pliers to remove a soaked white cloth from the neck of the bottle containing a clear liquid" however, this contradicts the sole photographic evidence depicting the cloth as dry. *See* Discovery Bates Stamped Shader_001120 and Discovery Bates Stamped Shader_001097.

emotionally charged protest who participates in that turmoil by spontaneously throwing a bottle at a police van to cause property damage.

Samantha Shader did not travel to the protest with the intent of harming police officers or threatening the lives of law enforcement or a surrounding crowd of fellow protestors.

## III.    CASE COMPARISONS

### A.  A Sentence of 60 Months Would Avoid Unwarranted Sentencing Disparities

A review of comparable and relevant cases supports a 60-month sentence. In this section, we discuss a number of federal arson prosecutions arising from the George Floyd protests that have resulted in dispositions, as well as other arson cases, assault on law enforcement cases, and assault on law enforcement in the January 6 insurrection context. What is clear from these cases is that prosecutions of people who conducted violent attacks with lit Molotov cocktails or other incendiary devices; who targeted police, police vehicles, and government buildings (including occupied police vehicles and occupied government buildings); and who in some cases caused or almost caused serious injury to law enforcement officers, have resulted almost exclusively in sentences below what the government is advocating for in Ms. Shader's case.

The vast majority of these cases resulted in guilty pleas to non-arson charges or charges with lower statutory minimums or maximums than the § 844(i) attempted arson plea in Ms. Shader's case, which carries a 5-year mandatory minimum and 20-year maximum sentence. This is true even where the defendant was initially indicted on charges that carried mandatory minimums, as in Ms. Shader's case. In many of the below cases the defendants (1) built the Molotov cocktail(s) themselves; (2) knew that they were in fact functional and lit Molotov cocktails; (3) premeditated the attacks; (4) accompanied their attacks with violent political rhetoric; (5) knew and intended that the police vehicle or building was occupied; and (6) the Molotov cocktails detonated as intended, often causing extensive fire damage and injury or the risk of injury. Some cases have also resulted in pleas to misdemeanors or deferred prosecution agreements.

As noted in the case charts below, most defendants have been permitted to plead guilty to a number of alternative charges that carry reduced exposure:

| Plea | Criminalizes | Exposure |
|---|---|---|
| 18 U.S.C. § 371 | General conspiracy | 0 to 5 years |
| 18 U.S.C. § 231(a) | Civil disorder | 0 to 5 years |
| 26 U.S.C. § 5861 | Making or possessing an unregistered explosive device | 0 to 10 years |
| 18 U.S.C. § 111(a) | Assault on officer | 0 to 20 years |
| 18 U.S.C. § 844(m) | Arson conspiracy | 0 to 20 years |

The count of conviction in these cases affects more than just the statutory sentencing exposure, it also leads to artificial disparities in the guidelines calculation. Because Ms. Shader pled guilty to an attempted arson under 18 U.S.C. § 844(i), the following calculation applies:

32

| | |
|---|---|
| Base Offense Level (§ 2K1.4(a)(1)): | 24 |
| Adjustment (§ 3A1.2(c)(1)): | +6 |
| Adjusted Offense Level: | 30 |

If, however, Ms. Shader had pled guilty to possession of an unregistered explosive device in violation of 26 U.S.C. § 5861, as have many similarly situated defendants, her guidelines would be drastically different:

| | |
|---|---|
| Base Offense Level (§ 2K2.1(a)(4) or (a)(5)): | 18 or 20 |
| Case-Dependent Enhancements | |
| Offense Involved Destructive Device (§ 2K2.1(b)(3)(B)): | + 2 |
| Possessed In Connection with Another Felony (§ 2K2.1(b)(6)(B)): | + 4 |
| Adjusted Offense Level: | 18 to 26 |

It is the count of conviction, rather than the nature of the conduct, that drives the guidelines in these cases. As stated in more detail below, many defendants whose attacks on police officers or police property were equally if not more serious than Ms. Shader's have far lower guidelines than she does.

Finally, as far as we are aware from our review of the case files, none of the below cases involved cooperation. All facts and guidelines calculations below are drawn either from the plea agreement or from the government's sentencing memoranda.

### B. Ms. Shader Should Not Receive a Higher Sentence Than Defendants Who Targeted Police Vehicles And Precincts They Knew To Be Occupied

The following cases involved defendants who committed Molotov cocktail and incendiary device attacks on police vehicles and precincts that they knew to be occupied:

| Targeted Police Vehicles And Precincts They Knew To Be Occupied | | | |
|---|---|---|---|
| Case | Disposition | Exposure | Sentence |
| *Ashton Nesmith*, 20-cr-156 (D.D.C.) | § 5861(d) | 0 – 10 | 71 months |
| Constructed a Molotov cocktail and threw it at a police officer who was parking his vehicle in front of the 6th District police station in Washington, D.C. Nesmith knew the vehicle was occupied. The lit Molotov struck the windshield causing damage, bounced off, and burst into flames when it hit the ground. Nesmith constructed the Molotov cocktail, planned the attack, and fled on foot. He had a lengthy violent criminal history. | | | |
| *Desmond David-Pitts*, 20-cr-143 (W.D.WA) | § 371 | 0 – 5 | 20 months |
| Set a fire at an occupied Seattle precinct's sallyport door during a protest. Over an eleven-minute period, David-Pitts piled up trash, repeatedly set it on fire, and fed the flames with more trash, while his co-conspirators attempted to barricade the precinct doors so that the | | | |

police officers could not escape the burning building. Separately, David-Pitts threw a wine bottle at a police officer, and helped break through the chain link fence that served as the perimeter of the East Precinct building. The fire set by David-Pitts caused extensive damage to the police building.

| | | | |
|---|---|---|---|
| *Dylan Robinson*, 20-cr-181 (D.MN) | § 371 | 0 – 5 | 48 months |

Threw multiple lit Molotov cocktails at a Minneapolis precinct headquarters that he knew to be occupied by numerous police officers. Robinson also set fire to a flammable pile of materials inside the Third Precinct building. These attacks led to the near total destruction of the precinct.

| | | | |
|---|---|---|---|
| *Branden Wolfe*, 20-cr-181 (D.MN) | § 371 | 0 – 5 | 41 months |

During the same Third Precinct attack as Robinson, Wolfe added additional fuel to a fire at the entrance to the Precinct, which he knew to be occupied. Later that evening, Wolfe entered the Precinct building and stole numerous items including a police vest, duty belt, handcuffs, earpiece, baton, knife, riot helmet, pistol magazine, police radio, and ammunition. Two additional defendants on the same docket as Robinson and Wolfe were sentenced to 36 and 24 months for breaching the precinct perimeter and using incendiary devices inside the precinct to set fire to the building.

| | | | |
|---|---|---|---|
| *Wil Floyd*, 17-cr-149 (W.D.WA) | § 5861(d) | 0 – 10 | 37 months |

Threw lit Molotov cocktails at police officers during a May Day protest. One of the Molotovs he threw at police shattered at the feet of an officer and ignited the officer's trousers when a flash-bang grenade went off, setting the gasoline on fire. The officer suffered burn injuries and was transported to the hospital for treatment. Floyd fled, and the next day posted remarks online ridiculing images of Seattle police officers who had been injured during the protests. Floyd had previously said that he was going to "kill them all with fire," referring to Seattle police officers. He constructed six explosive devices using beer bottles and gasoline, and threw five of them directly at police officers.

| | | | |
|---|---|---|---|
| *Sergey Turzhanskiy*, 12-cr-645 (D.OR) | § 5861(d) | 0 – 10 | 30 months |

Threw a lit Molotov cocktail at a police car in a Portland precinct parking lot. Numerous police officers were in the parking lot at the time due to a shift change. The device bounced off the hood of the car and initially failed to break. Turzhanskiy picked up the device and threw it at the vehicle a second time, causing a fire. Turzhanskiy, a member of an anarchist group, perpetrated the attack to make a political statement. He had constructed the Molotov device and planned the attack.

| | | | |
|---|---|---|---|
| *Abdimana Habib*, 20-cr-194 (D.ND) | § 231(a) | 0 – 5 | 4 months |

On May 30, 2020, Habib participated in riots in Fargo following the murder of George Floyd. Habib broke into several Fargo businesses; threw rocks at police officers who were attempting to keep the peace; and attempted to light a Molotov cocktail, which he intended to throw at police.

| | | | |
|---|---|---|---|
| *Kelly Jackson*, 20-cr-148 (W.D.WA) | § 5861(d) | 0 - 10 | 40 months |

On May 30, 2020, Jackson threw two lit Molotov cocktails (separated by 76 minutes) at Seattle police. Jackson threw the first incendiary device into the open driver's side door of a police car. The flames spread rapidly and the police vehicle was destroyed. Later that evening, Jackson attacked a second Seattle Police Department car with a Molotov cocktail. This time the incendiary device bounced off the police car's window and shattered on the sidewalk, spraying flames in a 12- foot radius in the vicinity of numerous bystanders. Jackson had previously researched how to make Molotov cocktails, had made the Molotov cocktails the day prior to his attack, and filmed himself preparing for the attack.

| *Matthew Lee Rupert,* 20-cr-104 (D.MN) | § 5861(f) | 0 - 10 | 105 months |
|---|---|---|---|

On May 28, 2020, Rupert traveled to Minneapolis with a duffel bag full of artillery-shell fireworks and recruited a juvenile and two others to join him. He is seen on video passing out numerous Molotov cocktails, encouraging other protesters to throw the explosives at law enforcement officers. Rupert is seen on video stating "[t]hey got SWAT trucks up there . . . I've got some bombs if some of you all want to throw them back . . . bomb them back . . . here I got some more . . . light it and throw it." Several more destructive devices were later recovered from his car. In a separate incident, Rupert used lighter fluid to set a Sprint store on fire after entering the building. The resulting fire led people to race for the exits, and destroyed the store. He also participated in the looting of an Office Depot. In criminal history category VI, Rupert's guidelines were 92 to 115 months.

### C. Ms. Shader Should Not Receive a Higher Sentence Than Defendants Who Carried Out Successful Incendiary Attacks on Police Vehicles and Government Buildings

Ms. Shader's offense of conviction is attempted arson. She should not receive a higher sentence than the many defendants whose incendiary devices actually caused a fire and set police property ablaze. Most defendants who conduct caused actual conflagrations have received plea offers to non-arson charges with significantly lower non-arson guidelines. In addition to the cases outlined above, where defendants set fires knowing that police officers were in harm's way, we note the following additional cases where defendants successfully detonated their incendiary devices and caused extensive burn damage and in some cases injuries to police officers:

| Arson Attacks On Police Vehicles, Precincts, And Other Government Buildings | | | |
|---|---|---|---|
| Case | Disposition | Exposure | Sentence |
| *Colin Mattis / Urooj Rahman,* 20-cr-203 (BMC) (E.D.N.Y.) | § 371 | 0 – 5 | [Pending Sentence] |
| Mattis and Rahman purchased gasoline, beer bottles, and toilet paper, and used those materials to make multiple Molotov cocktails. On May 30, 2020, Mattis and Rahman drove to the NYPD's 88th Precinct Stationhouse in Fort Greene, ignited the Molotov cocktail, and used it to set fire to and destroy an NYPD vehicle. At least two other people were near the vehicle, and if the flames had not quickly been extinguished, the fire could have easily spread and threatened pedestrians and other officers. | | | |
| *Shawn Jenkins,* | § 5861(d) | 0 – 10 | 40 months |

| | | | |
|---|---|---|---|
| 20-cr-639 (S.D.N.Y.) | | | |
| Threw a lit Molotov cocktail at two police vehicles at the 42nd Precinct. The Molotov hit an adjoining vehicle owned by a police officer, detonated, and partially burned the car. Jenkins had 14 prior criminal convictions including a federal gun possession conviction in the S.D.N.Y., and two separate prior state convictions for firearms possession. | | | |
| *Elaine Carberry et al.*, 20-cr-544 (S.D.N.Y.) | § 371 | 0 – 5 | 6 months for both defendants |
| Co-defendants Carberry and Smith threw a lit Molotov cocktail at an NYPD van, setting it on fire. Several minutes later, as the flames subsided, they added accelerant, engulfing the police van and totally destroying it. The government recommended a sentence of a year and a day, which was below the 37 to 46 month guidelines. | | | |
| *Victor Sanchez-Santana*, 20-cr-480 (S.D.N.Y.) | Deferred Prosecution | - | - |
| Sanchez-Santana lit a cloth glove on fire and placed it on the pavement underneath an NYPD vehicle, with the intention of setting the vehicle on fire. The defendant then drove off as the glove burned. | | | |
| *Kelly Jackson*, 20-cr-148 (W.D.WA) | § 5861(d) | 0 – 10 | 40 months |
| Threw two lit Molotov cocktails (separated by 76 minutes) at two different Seattle police vehicles. Jackson threw the first incendiary device into the open driver's side door of a police car. The flames spread rapidly and the police vehicle was destroyed. Later that evening, Jackson attacked a second Seattle police car with a Molotov cocktail. This time the incendiary device bounced off the vehicle's window and shattered on the sidewalk, spraying flames in a 12-foot radius in the vicinity of numerous bystanders. Jackson had constructed the Molotov cocktails the day prior to his attack, and filmed himself preparing for the attack. | | | |
| *Jesse Smallwood et al.*, 20-cr-23 (D.GA) | § 371 | 0 – 5 | 21 months for the two most culpable defendants |
| Fired flare gun cartridges into a Gainesville, GA police vehicle, setting it on fire. Smallwood recruited four co-conspirators, they planned the attack, donned masks and bandanas, and fled the scene in Smallwood's vehicle. | | | |
| *Jerritt Pace*, 20-cr-104 (D.D.C.) | § 5861(f) | 0 – 10 | 36 months |
| Attempted to set fire to the Fourth District Station in Washington, D.C., by igniting a device he had constructed, a detergent bottle filled with gasoline and a wick. The device fell to the ground, exploded, and burned on the sidewalk. Pace was in criminal history category VI due to an extensive record. The plea offer included the dismissal of two open D.C. Superior Court criminal cases, and the government recommended a sentence substantially below guidelines. | | | |
| *Davon Turner*, 20-cr-181 (D.MN) | § 371 | 0 - 5 | 36 months |
| Turner, as part of the same Third Precinct attack as Robinson and Wolfe, brought an incendiary device to the protest, breached the Third Precinct perimeter, entered the Third Precinct with the incendiary device, and once inside used it to set fire to the Precinct. | | | |
| *Garrett Patrick Ziegler*, 20-cr-188 (D.MN) | § 844(i) | 5 - 20 | 60 months |
| Set fire to the Dakota County Western Service Center ("DCWSC"), which he chose as a | | | |

target because his co-defendant had previously attended court appearances in the building and because of its connection to law enforcement following the murder of George Floyd. Ziegler recorded a series of videos, which he posted to SnapChat, where he threatened to harm law enforcement personnel and government property and advocated that others do the same. Ziegler purchased or provided items necessary to carry out the attack on the DCWSC, including mason jars, pushpins and other sharp objects, isopropyl alcohol, nail polish remover, bottles of high-proof alcohol, lighter fluid, bandanas, scarves, and a baseball bat. Ziegler and his co-defendant constructed numerous Molotov cocktails, and filled some of them with sharp objects including pushpins and tacks, in order to thwart efforts at extinguishing the flames and cleaning up the damage by injuring anyone who responded to the fire. Ziegler drove himself and his codefendant to the DCWSC. They used baseball bats to break windows and proceeded to throw multiple Molotov cocktails through the windows. Several of the devices successfully ignited and caused significant fire and water (from the sprinklers) damage to the DCWSC. Ziegler also attempted to start other fires at the DCWSC by pouring ignitable liquids and throwing more Molotov cocktails in and around the broken windows, then attempting to set the liquids on fire. Ziegler and his co-defendant had also attacked the DCWSC with Molotov cocktails two days prior but the devices failed to ignite.

| Judah Coleman Bailey, 20-cr-23 (D.GA) | § 371 | 0 - 5 | 21 months |
|---|---|---|---|
| Bailey participated in an attack on a parked Gainesville Police Department vehicle, setting it on fire with a flare gun. | | | |
| Killian Melecio, 21-cr-77 (D.NJ) | § 231(a) | 0 - 5 | 28 months |
| On May 31, 2020, during a protest over the murder of George Floyd in Trenton, NJ, Melecio participated in a Molotov cocktail attack on a Trenton Police Department vehicle. After Melecio's co-defendant threw a lit Molotov cocktail into the front driver's side window of the police vehicle, Melecio stuffed a shirt into the gas tank of the police vehicle and ignited it. Melecio fled when law enforcement tried to arrest him. Justin Spry, who assisted Melecio in attempting to set fire to the police vehicle, also pled guilty to one count of civil disorder. | | | |
| Sam Resto, 20-cr-350 (NGG) (E.D.N.Y.) | § 844(m) | 0 to 20 | [Pending Sentence] |
| Resto stated to an undercover officer that he wanted to use gasoline to set fire to an NYPD vehicle. He identified a nearby, unguarded NYPD vehicle that he wanted to ignite. As he tried to open a stolen jerry can to pour gasoline into smaller water bottles that he would use to ignite the vehicle, uniformed NYPD officers arrived in the vicinity, which prevented Resto from carrying out his plan. Instead, he proceeded to use the gasoline from the jerry can to light a trashcan on fire in Bay Ridge. Undeterred, Resto continued to plan an arson attack on an NYPD vehicle and other attacks on New York City landmarks and infrastructure. For example, on July 13, 2020, Resto brought gasoline and empty water bottles to an Occupy City Hall protest in Manhattan, and said that he wanted to purchase caltrops to puncture NYPD vehicle tires. On July 15, 2020, he was arrested for obstructing traffic and later stated that he wanted to burn down an NYPD vehicle in retaliation. On July 28, 2020, he purchased gasoline from a gas station located in Elmhurst, New York and then traveled to Manhattan to a protest near Gracie Mansion. Multiple co-conspirators and the undercover officers attempted to convince the defendant not to carry out the attack. And yet Resto broke the front window of the NYPD | | | |

Vehicle with a blunt instrument and poured gasoline into the interior. Resto then lit the NYPD Vehicle on fire and fled to Central Park. The defendant further stated that he "was ready for round two," could not wait to burn another car, and that anytime the police arrested a protestor they should burn a cop car to send a message.

### D. Ms. Shader Should Not Receive a Higher Sentence Than Defendants In Other Relevant Assault On Law Enforcement Officer Cases

The below cases involve, among other things, attempting to cut the brake-line of an NYPD vehicle, which could have led to the deaths of police officers and bystanders; discharging a firearm at police officers; assaulting officers with makeshift weapons and bottles; and trying to take down a police aircraft with a laser. None of these cases resulted in a sentence above 60 months:

| Other Assaults on Law Enforcement Officers | | | |
|---|---|---|---|
| Case | Disposition | Exposure | Sentence |
| *Jeremy Trapp*, 20-cr-308 (WFK) (E.D.N.Y.) | § 33(a), § 1343 | 0 - 20 | 18 months |
| Trapp crawled under a marked NYPD van in Sunset Park and partially severed a line that is part of the van's anti-lock braking system, which is similar in appearance to, and in the same location as, the NYPD vehicle's main brake line. A malfunctioning anti-lock braking system adversely impacts a driver's ability to stop and maintain control of a vehicle in an emergency. Cutting the brake lines of an NYPD vehicle would not only threaten the safety of police officers, it would endanger the lives of anyone in that vehicle's path. Trapp had previously told a confidential informant that the police were racist, that he wanted to harm police officers and their supporters, and that he had previously been involved in destroying property and burning a police car. Trapp further stated that he wanted to "burn the [Verrazzano-Narrows] bridge down" so that "white supremacists" could not use it to get to Brooklyn from Staten Island. Trapp also told the informant that he wanted to conduct reconnaissance of the Verrazzano Bridge, that the demonstrations were too non-violent, and that he wanted to cut the brake lines on police cars instead of going to demonstrations. Trapp was sentenced to 18 months by the Honorable William. F. Kuntz, and to an additional 18 months to be served concurrently for committing wire fraud in connection with the Covid-19 pandemic-related Economic Injury Disaster Loan Program. | | | |
| *John Boampong*, 20-cr-10321 (D.Mass) | § 231(a), § 922(n) | 0 - 10 | 60 months |
| Boampong incited panic in downtown Boston by firing 11 rounds in the direction of police officers and civilians, with a firearm he was not allowed to carry. Boampong fired his Sig Sauer pistol 11 times toward officers, including a deputized federal officer. The officers took cover by bracing or ducking behind cars and other objects. Bullets broke through the windows of two apartments above ground level in a building behind some of the officers. Boampong was a prohibited person at the time because he was under indictment on an unrelated felony state case. | | | |
| *Alexandra Eutin*, 20-cr-459 (D.OR) | § 231(a) | 0 - 5 | DP and 30 hours community service |

On July 16, 2020, Eutin joined a protest outside of the Portland Police Bureau. The group she was part of began yelling that they intended to enter the Precinct building and burn it down. The group then started a small fire. Eutin observed a PPB officer attempting to make an arrest of an another individual. Eutin had a makeshift sign/shield made out of wood that she was carrying in her hand. She raised up the wood sign and struck the officer in the head with it.

| *Joshua Warner*, 20-cr-442 (D.OR) | § 231(a) | 0 - 5 | DP |
|---|---|---|---|

During an August 8, 2020 protest, Warner directed a green laser pointer into the eyes of multiple Portland police officers. Laser pointers can cause significant and lasting eye damage in addition to temporarily blinding the officers. Warner subsequently resisted arrest.

| *Alexa Graham*, 20-cr-449 (D.OR) | § 39A | 0 - 5 | DP |
|---|---|---|---|

On August 7, 2020, Graham attempted to blind the pilot of a Portland Police Bureau Cessna aircraft with a green laser pointer by pointing it at the cockpit of the airplane more than ten times. The PPB Cessna was serving as a tactical flight observer during the protests.

| *Keyondre Robinson*, 20-cr-185 (W.D.NY) | § 111(a) | 0 - 20 | Time Served |
|---|---|---|---|

On May 30, 2020, at a protest outside the federal courthouse in Buffalo, NY, Robinson, a member of the Crips, threw a bottle at a U.S. Marshal who was guarding the courthouse perimeter. The bottle struck the Marshal in the face.

### E. Ms. Shader Should Not Receive a Higher Sentence Than Defendants Who Assaulted Law Enforcement Officers During the January 6 Insurrection

Most defendants charged with violently and often repeatedly assaulting police officers, in the context of an insurrection that struck at the heart of our government, have also received sentences lower than what the government is advocating for in Ms. Shader's case:

| January 6 Attacks on Police Officers and Government Buildings | | | |
|---|---|---|---|
| Case | Disposition | Exposure | Sentence |
| *Robert Scott Palmer*, 21-cr-328 (D.D.C.) | § 111(a) | 0 - 20 | 63 months |

Palmer first threw a wooden plank at police officers. He then sprayed the contents of a fire extinguisher at the officers, and when it was empty, hurled it at the officers. Palmer then rooted around for additional materials with which to assault the police, including throwing the fire extinguisher a second time. At this time, after his assaults had occurred, Palmer was pepper sprayed by law enforcement. But the pepper spray only deterred Palmer for a short while. A few minutes later, on the West Plaza, Palmer assaulted another group of law enforcement officers with a 4 to 5 foot pole. Palmer demonstrated a complete lack of remorse.

| *Devlyn Thompson*, 21-cr-461 (D.D.C.) | § 111(a) | 0 - 20 | 46 months |
|---|---|---|---|

Thompson was one of the first rioters to arrive and among the last to leave. During the several hours he spent attacking the U.S. Capitol, Thompson was actively assisting, aiding, and abetting the mob that was assaulting officers. He also injured an officer after striking him with a baton

| Duke Wilson, 21-cr-345 (D.D.C.) | § 111(a) | 0 - 20 | 51 months |
|---|---|---|---|
| During the January 6 insurrection, Wilson led a large crowd and pushed officers to try to gain entry to the Capitol. Wilson threw a heavy metal flagpole at Capitol police officers. He also swung a PVC pipe at an officer who was not wearing a helmet. Despite being pepper sprayed by officers, Wilson continued to fight them, and help open a door to enable other rioters to enter a tunnel and attack other police officers. | | | |
| Kevin Creek, 21-cr-645 (D.D.C.) | § 111(a) | 0 - 20 | 27 months |
| Creek, a former Marine, joined the insurrection at the U.S. Capitol on January 6. During the riot, he punched, pushed, and kicked a police officer who was trying to control the crowd and deter Creek from entering the Capitol. | | | |
| Cody Mattice et al., 21-cr-657 (D.D.C.) | § 111(a) | 0 - 20 | 44 months for both defendants |
| Mattice and Malt planned to bring batons, pepper spray, helmets, and eye protection to U.S. Capitol on January 6. Mattice pulled down a segment of the metal barricades that stood in front of a police line. A short time later, rioters overwhelmed the police line, forcing officers to retreat up a central staircase to the Lower West Terrace. Mattice and Mault were part of the group that assaulted the police line. They stood at or near the front of the group, pushing forward against the officers, who attempted to keep the rioters from advancing. Mattice and Malt both obtained canisters of chemical spray from other rioters and sprayed them at the officers defending the entrance into the U.S. Capitol. | | | |
| Greg Rubenacker, 21-cr-193 (D.D.C.) | § 111(a) | 0 - 20 | 41 months |
| Rubenacker engaged in a series of confrontations with law enforcement inside the Capitol Building on January 6. He chased a Capitol Police officer, and then smoked marijuana in the Rotunda, posting it to social media with the caption, "Smoke out the Capitol, baby." He later swung a plastic bottle at an officer's head, and sprayed water at officers until he was finally subdued with pepper spray. | | | |
| Matthew Miller, 21-cr-75 (D.D.C.) | § 111(a) | 0 - 20 | 33 months |
| Miller led a mob of rioters during the Jan 6 insurrection. He threw a full beer can towards police and used a section of temporary barriers as a ladder to scale the walls of the west side of the plaza, and assisted other insurrectionists in scaling the walls. He led the mob in pushing back Capitol police officers, directing the coordinated assault on officers while yelling "Heave! Ho!" He also threw objects at police officers, and used a fire extinguisher to assault officers inside a tunnel. | | | |
| Nicholas Languerand, 21-cr-353 (D.D.C.) | § 111(a) | 0 - 20 | 44 months |
| The defendant in this matter pled guilty to assaulting officers with a dangerous weapon. Languerand put himself among the front ranks of the rioters and threw a variety of dangerous objects at the police, which he bragged about on social media after the riot. | | | |
| Mark Leffingwell, 21-cr-005 (D.D.C) | § 111(a) | 0 - 20 | 6 months |
| Leffingwell, a former member of the Washington National Guard, pushed his way to the front of a crowd inside the Senate Wing entrance to the Capitol. When Capitol police officers tried | | | |

to prevent his further advance into the U.S. Senate, Leffingwell, punched one officer repeatedly in the head and chest with a closed fist. Lefingwell subsequently attacked a second officer as well.

| *Ricky Willden*, 21-cr-423 (D.D.C.) | § 111(a) | 0 - 20 | 24 months |
|---|---|---|---|

On Jan. 6, 2021, Willden was illegally on the Capitol grounds, standing near the East Columbus doors to the Capitol Building. At approximately 2:35 p.m., he raised a small green cannister and sprayed U.S. Capitol Police officers with a chemical irritant. After spraying the irritant, he threw the cannister at the officers

| *Howard Richardson*, 21-cr-721 (D.D.C.) | § 111(a) | 0 - 20 | 46 months |
|---|---|---|---|

Richardson made his way past police officers barricades and entered a restricted area of the U.S. Capitol, waving a Trump flag. He then approached a line of police officers, picked up a flagpole, and forcefully swung it downward to strike a police officer behind the barricade, making contact with the officer. Richardson then swung again, and again a third time, using enough force to break the flagpole

| *Thomas Webster*, 21-cr-208 (D.D.C.) | § 111(a) | 0 - 20 | 120 months |
|---|---|---|---|

Webster, a former Marine and NYPD officer, illegally entered the Capitol grounds wearing a bulletproof vest and carrying a large metal flagpole bearing the red and yellow flag of the U.S. Marine Corps. Webster approached an officer from the Metropolitan Police Department who was behind the metal gates Webster then aggressively shoved the metal gate into the officer's body. He raised the flagpole and forcefully swung it toward the officer. The officer managed to wrest the flagpole away. Webster, however, then broke through the metal barricade, tackled the officer to the ground, and tried to remove his helmet and gas mask, choking him. During this attack, the officer struggled to breathe. While Webster had the officer restrained on the ground and unable to breathe, others in the mob began kicking the officer. The officer sustained several injuries as a result of Webster's attack.

| *Marshall Neefe et al.*, 21-cr-567 (D.D.C.) | § 111(a) | 0 - 20 | 41 months for both defendants |
|---|---|---|---|

Neefe and Smith communicated with each other and others on Facebook in the weeks preceding Jan. 6, 2021, sharing intentions to travel to D.C. and bring batons. On January 6, both illegally entered the Capitol grounds. Neefe carried the wooden club. They both participated in pushing a large metal sign frame – at least eight feet tall and 10 feet wide – into a defensive line of officers attempting to prevent the mob from further advancing on the west front plaza of the Capitol. Neefe later entered the Capitol building, including the Rotunda, disregarding commands to leave.

| *Kyle Young*, 21-cr-291 (D.D.C.) | § 111(a) | 0 – 20 | 86 months |
|---|---|---|---|

Young was among a mob of people participating in the assault of law enforcement officers in the Lower West Terrace of the Capitol and the Archway that leads into the building. A group of officers from the U.S. Capitol Police and Metropolitan Police Department (MPD) formed a line at the door to prevent the mob from entering. Young joined the rioters who were pushing against the police line, and while in the tunnel area beneath the Archway, he held a strobe light toward the police line and pushed forward a stick-like object. He assisted in throwing a large audio speaker toward the police line. Another rioter pulled a Metropolitan Police Department officer

through the tunnel and into the crowd outside. The MPD officer – wearing a uniform, marked helmet and tactical vest – was assaulted while he was in the mob by rioters, including Young. Young held the officer's left wrist and pulled the officer's arm away from his body. The MPD officer was then swept further in the crowd. He was rendered momentarily helpless when an individual repeatedly applied a taser to the back of his neck. Young also made contact with the helmet of a different Capitol Police Officer who was pulled into the crowd.

| *Lucas Denney*, 22-cr-70- (D.D.C.) | § 111(a) | 0 - 20 | 52 months |
|---|---|---|---|

On Jan. 6, Denney, a former military police officer, spent 90 minutes attacking officers. Soon after illegally entering the grounds, Denney repeatedly confronted police officers protecting the Capitol. At the west side of the Capitol, he fought with officers at metal barricades, punching one of them in the face shield, sprayed what appeared to be a chemical irritant at officers on two occasions, grabbed and shoved an officer, and joined another rioter in launching what appeared to be a large tube towards a line of officers. He attempted to disarm an officer by grabbing the officer's crowd-control spray, then swung a pole at the officer. Denney entered the tunnel leading into the Capitol Building, pushing a riot shield into and on top of a line of officers attempting to secure the area. Denney also participated in "heave-ho" efforts to advance into the building. At one point, on the steps leading up to the Capitol Building, he swung his arm and fist at an officer who other rioters had pulled out of the tunnel, pulling the officer further down the stairs.

| *Mark Ponder*, 21-cr-259 (D.D.C.) | § 111(a) | 0 - 20 | 63 months |
|---|---|---|---|

Ponder assaulted three police officers in a series of incidents in the western portion of the Capitol grounds. After rioters overwhelmed police lines in the West Plaza, Ponder ran out from the crowd and swung a long, thin pole at a Capitol Police officer. The officer protected himself by raising his riot shield above his head. Ponder's pole struck the riot shield and broke in two, with part of the pole flying off to the side. Ponder then retreated into the crowd. Moments later, he re-armed himself with a new, thicker pole that was colored with red, white, and blue stripes. Ponder joined a crowd of rioters that faced off against a line of officers with the Metropolitan Police Department in the Upper West Terrace. He swung the same striped pole and banged it against the ground in a menacing manner. Then, as the police officers advanced to move the crowd, Ponder wildly swung the pole at the advancing police line, striking an officer in the left shoulder.

| *Scott Kevin Fairlamb*, 21-cr-00120 (D.D.C.) | § 111(a) | 0 - 20 | 41 months |
|---|---|---|---|

The defendant in this matter pled guilty to assaulting officers while armed with a police baton. The government expressly reserved the right to seek an upward departure under the terrorism guideline and chose not to.

## F. Ms. Shader Should Not Receive a Higher Sentence Than Defendants In Other Arsons Who Caused Extensive Damage and Risk to Life

The below cases, while not targeted at law enforcement, all caused millions of dollars in damage and involved brazen premeditated and often repeated attacks that could have easily killed innocent occupants or bystanders:

| Other Molotov and Incendiary Attacks | | | |
|---|---|---|---|
| Case | Disposition | Exposure | Sentence |
| Luis Saquicili, 18-cr-137 (S.D.N.Y.) | § 5861(f) | 0 - 10 | Time Served |
| Saquicili threw a lit Molotov cocktail into a crowded bar in Manhattan. He was angry about being denied entry to the bar earlier that evening. The bar caught fire causing extensive damage, though no one was injured. | | | |
| Evon Stephens, 18-CR-539 (ILG) (E.D.N.Y.) | § 844(i) | 5 - 20 | 60 months |
| Stephens set fire to vehicles in the Kings Plaza Shopping Center in Brooklyn, ultimately damaging 135 Mercedes Benz cars. Stephens was solely responsible for $7,119,269.00 in restitution based on the damage he caused. | | | |
| *Daniel Melamed*, 19-CR-443 (S.D.N.Y.) | § 844(i) | 5 - 20 | 66 months |
| Melamed was a real estate developer who burned families out of their homes so that he could develop and flip the properties at a profit. He orchestrated multiple fires at occupied residential buildings, to terrorize and thereby drive out the occupants of these residential buildings, because he felt that lawfully evicting them would be too burdensome for him. Melamed retained a number of individuals to set the fires, which were uniformly set at night when the occupants of the targeted properties were asleep. The fires resulted in substantial damage, particularly in the case of a single-family home which was largely incinerated and from which the members of the family who lived there escaped with their lives but not any of their multiple pets, who were burned alive, or their belongings, which were largely destroyed. | | | |

## IV.   REMORSE AND REHABILITATION

### A.  Trauma Connection to Arrest Conduct

In order to fully understand the immediacy of Samantha's remorse for making the impulsive choice to throw the bottle that night, it is necessary to understand her state of mind that night.  Samantha's functioning and decision making were both impaired by alcohol and multiple incidents of trauma throughout her life, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Understanding Sam's actions requires looking at each of these factors at play.





The staggering amount of alcohol Ms. Shader consumed throughout the day and night of May 29, 2020 played a significant role in her functioning and judgment that night. Sam admitted to having been heavily inebriated at the protest. In the hours leading up to and during the protest she consumed an enormous amount of alcohol in combination with ingesting a homemade tincture of marijuana and grain alcohol.



Exhibit A at 4. Her mind was clouded and her judgement was substantially impaired as she moved through a crowded and intense environment.

it is abundantly clear that the cumulative impacts of numerous and repeated traumas has powerfully affected Ms. Shader over the course of her life in a number of domains. *See* See Exhibit B. Ms. Shader's functioning the night of her arrest must be understood in the context of those impairments.

his disconnection not only affected her decision-making but her fundamental ability to clearly perceive the highly stressful and rapidly changing environment around the protests.

Finally, the physical environment of the protests disoriented and destabilized Ms. Shader. People who have suffered serious trauma can experience alterations in their nervous system response to threat, such as hyper-vigilance, (exaggerated threat detection) and hyper-arousal (states of intense reactivity into fight or flight). These symptoms can be triggered by environmental cues that activate the person's dysregulated nervous system, leading to states of fear and panic.

On this night, many environmental triggers were present and disorienting to Samantha's threat detection system. Body camera video shows police officers physically shoving protesters and spraying mace— something that Samantha experienced firsthand. Evidence shows protesters chanting and pushing back as well. Nearly all of Samantha's senses were compromised by the chaos of the protests and this environment exacerbated her already impaired functioning. ██████████████████████ ██████████████████  In spite of her intention to participate in the protest without causing harm to others, once there she was overwhelmed by chaos of it and acted impulsively and in a way that she has expressed profound remorse about from the start.



Samantha, like many others that night experienced grief over the violent death of Mr. Floyd. ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ███████████████████████████████ and information about the circumstances of that night that her functioning on the night of her arrest led her to be severely impaired in her ability to accurately perceive the police van at which she threw the bottle. She did not believe there were police officers in the van, and she did not intend to cause anyone physical harm.

**B. Samantha's Genuine Remorse**

It is hard to convey in writing how genuine Sam's remorse is. Hearing her talk about it or watching her interrogation with the NYPD is helpful, because writing about it does not do it justice. When Sam usually discusses difficult topics, she uses humor to cope with sharing. However, acknowledging that there were people in the van is one of the few things that brings Samantha to tears.

Sam also held shame about her treatment of the cop who arrested her. As she told him early on in the interrogation:

02:42:22    SHADER:    I'm [expletive] sorry, dude. I'm really fucking sorry man. And I hope you're alright. I wasn't trying to fucking hurt anybody . . . It's not why I wanted to come here. . . I'm not trying to hurt somebody because somebody else [George Floyd] got hurt.

*See also* Interr. at 16:52:53 ("I did something awful."); *id.* at 02:46:30 ("I don't, I don't, I don't understand, I don't, really I have no excuse at all . . . no, I can't, I can't even personally understand at all."); *id.* at 3:00:41 (reflecting more on her conduct she says under her breath: "Shameful."); *id.* at 03:00:55 ("I didn't help anybody. That's the thing. Nobody got helped. I didn't help anybody. . . . No one's helped from this. If anything it's probably going to make everything worse, really.").

Ms. Shader immediately recognized that her actions not only had the potential to physically endanger others but harmed the very movement she was seeking to support.

Ms. Shader learned afterward from speaking with him that the arresting officer played basketball with kids in the city and was a decent guy a "decent human being."[25] That she had empathy, insight and remorse for her actions indicated she had acted in a way that was completely a result of her trauma history and inebriation, triggered by a chaotic and scary environment. Her actions did not come from a place of malice; they came from severe trauma triggers.

Sam did not intend to hurt anyone that night. Rather, her past has shown that she has been on the receiving end of violence relentlessly throughout the course of her young life.

On May 29, 2020 Samantha's personal history converged with a social movement. Through working with mitigation specialists, participating in groups at the MDC, reading and reconnecting with family, Samantha has been spending the past year trying to learn what led her to make a choice she would come to inexorably regret.

### C. Pretrial Detention at MDC Brooklyn

Samantha has been detained at the MDC Brooklyn since May 30, 2020. Since that time she has achieved remarkable personal goals and worked incredibly hard to process her trauma to better understand her thinking and motivations. She has taken her current circumstances very seriously and commits to chartering a positive course for her life when she comes home.

### *High School Equivalency*

Samantha obtained her High School Equivalency (HSE, formerly GED) while detained at the MDC Brooklyn. At the time of writing, she is the only person to have done so this year.



Samantha worked extremely hard to prepare for the exam; she worked one-on-one with a tutor, worked through practice exams and workbooks, and sat through an official, timed practice exam.

Sam had wanted to get her GED for years, but never signed up for a program because she was battling serious substance abuse issues and rarely in the same place long enough to complete a preparatory course. Since the time of her arrest, she expressed an interest in getting her GED and she is proud to have worked so hard to obtain it.

In fact, Samantha's success at the GED led her to become her unit's GED class teacher. The MDC education department selected Samantha to lead a preparation class and approached her about the opportunity which she immediately accepted. Samantha teaches Mondays through Fridays from 1:30-3:30pm and enjoys helping other women work towards achieving their goals.

### Columbia University Justice-in-Education Program

Upon obtaining her GED, Samantha immediately enrolled in Columbia University's Justice-in-Education (JIE) program so she could start taking college-level coursework. The program almost did not accept her because she had not yet received her GED test results in time and missed the first class. As soon as Samantha passed, she stayed up all night working on the first class's written assignment and showed up to class prepared the next day. Impressed by her fortitude and dedication, the program accepted Samantha. She will earn college credits and be able to participate in JIE when she returns home.

### Programming and absence of disciplinary records

Enclosed with this submission as Exhibit C are a total of ninety-four certificates for programs Samantha successfully completed. Notably, she completed the Non-Residential Drug Abuse Treatment program (N-RDAP), a twelve-week cognitive behavioral therapy treatment program that addresses "criminal lifestyles and provides skill-building opportunities in the areas of rational thinking, communication skills, and institution/community adjustment."[44] After years of falling through the cracks of various institutions—education, child welfare, public safety and medical among others—Samantha finally received help treating her substance abuse.

---

[44] Federal Bureau of Prisons website, Retrieved on April 26, 2021 from:
https://www.bop.gov/inmates/custody_and_care/substance_abuse_treatment.jsp.

Samantha also successfully completed a workshop called Trauma in Life for which she received a certificate in January 2021. Through this group she began to truly examine the role trauma has played in her life.

In addition to availing herself of nearly every educational opportunity possible, Samantha has even attempted to start her own program. According to Jessica Pelkey, a woman who is incarcerated with Samantha at the MDC, "She even tried to start an A.A. group because they don't offer it to us here. She is always talking about how when she gets out, she wants to help women who suffer from addiction, mental and physical abuse like she has." Exhibit D1 (Letter of Jessica Pelkey).

While staying busy, Samantha has managed to not incur a single disciplinary infraction in her year at MDC—a year that was markedly more difficult for incarcerated people due to the COVID-19 pandemic. Her achievements in the past two years are all the more remarkable given the persistent lockdowns and staff shortages at the facility. Samantha refused to allow this to prevent her from working steadfastly on her goals and doing all that she could to stay productive, self-reflective, sober and ultimately begin to heal. Women in Samantha's unit struggled emotionally and physically through this year and some took it out on Samantha, yet she has not allowed other people to cloud her focus on her goals, her case and herself.

***Exploration of trauma and its connection to her arrest***

Over the past year, Samantha has been doing the excruciating work of examining her trauma history and unpacking its effects on her life. She had largely unacknowledged or diminished her pain until this point, not realizing that by doing so she was unintentionally putting herself in danger over and over again. By suppressing her feelings of fear and sadness around the abuse and neglect she endured, Samantha was living in a state of dissociation, with a compromised ability to detect danger.

Since the time Sam ran away from home at seventeen years old, she has largely been in consistent danger. Whether through violent intimate relationships, sharing needles with strangers to use dangerous drugs or making rash decisions without thinking, Sam has been unintentionally perpetuating the chaos she felt at home as a child.

She has been working hard to reassess her relationships with friends and family, and has invested in healthy ones while stepping away from unhealthy ones.

***Looking ahead to a bright future***

For the first time in fifteen years, Samantha Shader is sober. She has spent the past two years enduring the incredibly challenging and stressful circumstances of her case and incarceration without her familiar clutch of drugs and alcohol. She admits that she is not sure if she would have gotten sober without having been arrested. In a weird way, she says, she is grateful that she had been arrested because she got clean and obtained her GED.

48

Through intense introspection, academic studies and repairing relationships with her family, Samantha is thinking about the many opportunities that await her when she returns home. Her mother Amy reflects how "Sam has taken the most difficult of environments and found a way to not only be strong but resourceful… tapping into any opportunity she can to learn and better herself". Exhibit D.2 (Letter of Amy Shader). For example, she read a book on beekeeping which sparked her desire to open a beekeeping business on her dad's property.

She is also now considering attending a four-year college; something she had not taken seriously before. She also has an interest in working with automobiles; she was a gifted welder at BOCES, so it is clear she enjoys technical and manual work.

Samantha's father remains loyal and committed to building Sam's future. Her father is "amazed by the positive inner growth she managed to muster out of being in custody" Exhibit D.3 (Letter of Shawn Shader). and he will provide her a safe place to land when she goes home. Her goal is to get home as soon as possible to start the next chapter of her life, and to live a free and productive life that makes the world better for others. "Sam is really good at caring for people,"[45] her sister noted. Now Sam is starting to see that too.

### D.  Impressions and Recommendations

Samantha's life has a constant pattern: trauma, dissociation, chaos, and so it goes. Because Samantha has been operating largely in a state of disassociation, she has not fully or accurately perceived threats to her body. She turned towards danger and in her own words "ran towards chaos."[46]

Her time at the MDC has been transformative because it has offered her the opportunity to pause that pattern. For the first time, she is working hard to examine her life, ███████████ and how it affected her decisions. She has utilized the resources provided by MDC and her mitigation team to really unpack and look at her life.

Notably, Samantha is completely sober, allowing her introspection to fully take hold. Without the familiar clutch of substances, she has had to confront the pain that comes from deep psychological work. She is healing, and through her healing as started realizing her potential as a force for good.

Over the past two years at the MDC, Samantha has emerged as a leader and source of support for others. Gloria Rodriguez Gonzalez writes, "Samantha is always helping everyone in the unit…. [she] actively helps any inmate that needs advice." Exhibit D.5 (Letter of Gloria Rodriguez Gonzalez). Ms. Pelkey notes, "Even with everything Ms. Shader is going through she is one of the most supportive people I know." Exhibit D.1.

Samantha has also been working hard to maintain and strengthen relationships with positive support networks, and to re-navigate her relationships that are sources of both love and pain. For instance, some of her relationships with family members have contributed to her

---

[45] Shader, D. Personal communication, April 9, 2021.
[46] Shader, S. Personal communication, December 23, 2020.

trauma history but are also important family connections. By looking inward and developing healthy boundaries, Samantha is learning how to relate to her family members in nuanced ways, rather than just run away from them or headfirst towards them.

From working closely with Samantha, it is clear she has abundant strengths. First, she is very intelligent. After ten years of homelessness and severe drug use and under the stress of incarceration, she was able to obtain her GED. Sam worked extremely hard to achieve this personal goal.

A source of strength for Samantha has been her sense of humor and levity. She can take a difficult situation and find its positive side, or even its humor, which has contributed to her resilience. For example, her father recalled her wearing plastic red heart shaped sunglasses and a bright yellow trucker hat while riding the tractor to clear his property. Darian remembered Samantha singing "The Time Warp" while they walked for miles after getting stranded on the side of the road in the rain.

Samantha is devoted to her loved ones. Throughout the tumult of her life, she still manages to care for her parents, sister and stepsiblings. Her family remains a support for her now and is dedicated to be there when she comes home. They anxiously await her return home. She is welcome back to her father's property where she can rebuild her life. Even while at the MDC, Samantha helps her fellow companions maintain their own family relationships. Ms. Pelkey notes: "She goes above and beyond for everyone. She helps make cards for everyone's families on holidays and birthdays." Exhibit D.1.

The following letters to the Court, marked D.1 to D.18, are enclosed on Samantha's behalf:

Exhibit D.1    Jessica Pelkey (fellow inmate)
Exhibit D.2    Amy Shader (mother)
Exhibit D.3    Shawn Shader (father)
Exhibit D.4    Darian Shader (sister)
Exhibit D.5    Gloria Rodriguez Gonzalez (fellow inmate)
Exhibit D.6    Aliyah Jade (friend)
Exhibit D.7    Jeff Butler (friend)
Exhibit D.8    Stephanie Perez (fellow inmate)
Exhibit D.9    Linsday Rothlein (friend)
Exhibit D.10   Kianu Schwerdtfeger (friend)
Exhibit D.11   Agot Schweter (grandmother)
Exhibit D.12   Laurie Shader (stepmother)
Exhibit D.13   Jay and Casie Shultis (friends)
Exhibit D.14   Meranda Werner (friend)
Exhibit D.15   Elizabeth Biscoe (stepsister)
Exhibit D.16   Elizabeth Brought (fellow inmate)
Exhibit D.17   John and Lorraine Cook (friends)
Exhibit D.18   Vincent Curry (stepfather)

Written by her family and loved ones, the letters speak to Samantha's character and to her commitment to realizing her full potential and leading a good and productive life.

## V.    CONCLUSION

Samantha Shader's life drastically changed on May 29, 2020. The night brought to a head a confluence of factors including her lifelong history of trauma and her significant substance abuse history, set amidst a chaotic environment. For her inexcusable and thoughtless decisions that night, Ms. Shader expressed sincere and heartfelt remorse. And her commitment to bettering herself while at MDC shows that through more trauma-informed counseling, continued sobriety and her development of a professional path, Samantha has the immense capacity to touch hearts and change lives, her own included.

For the reasons laid out in this submission, we ask the Court to sentence Ms. Shader to 60 months incarceration. Thank you for your consideration of this letter.

Respectfully Submitted,

_____/s/_____
Samuel Jacobson
Leticia Olivera
Amanda David
Assistant Federal Defenders

Danielle Azzarelli
Federal Defenders Social Worker

cc:    all counsel of record (by ECF)
       U.S. Probation (by Email)